**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**(MIAMI DIVISION)**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re | CASE NOS.  05-42040-BKC-AJC through |
| | 05-42049-BKC-AJC |
| **EPIXTAR CORP.,** | **(Jointly Administered)** |
| Debtor. | **CHAPTER 11** |

_____/

| | |
|---|---|
| **EPIXTAR CORP.,** | ADV. NO. 08-01208 BKC-AJC-A |
| **Plaintiff,** | |
| **v.** | |
| **MCCLAIN & COMPANY, L.C.** | |
| **CBIZ, INC.,** | |
| **Defendants.** | |

_____/

**DEFENDANTS MCCLAIN & COMPANY, L.C. AND CBIZ, INC.'S**
**MEMORANDM OF LAW IN OPPOSITION TO PLAINTIFF EPIXTAR CORP.'S**
**MOTION FOR SUMMARY JUDGMENT**

**NOW COME** Defendants, MCCLAIN & COMPANY, L.C. ("McClain") and CBIZ, INC. (collectively referred to as the "Defendants") and  file their memorandum of law in opposition (the "Opposition") to the Plaintiff, Expitar Corp.'s ("Epixtar" or "Plaintiff") motion for summary judgment (the "Motion") [D.E. 326].  In support of the Opposition, the Defendants respectfully represent the following:

**INTRODUCTION**

Epixtar moved for summary judgment arguing that CBIZ somehow caused McClain to resign from the audit engagement with Epixtar, which somehow caused Epixtar's stock to be delisted from the OTCBB, which somehow caused unspecified damage to Epixtar.  Defendants

assert that each of the Plaintiff's arguments are flawed, in material dispute, and lack the evidentiary support necessary to be awarded judgment as a matter of law.  For those reasons, Defendants filed this Opposition and a cross-motion for summary judgment with regard to the issues of proximate causation and causation of damages in this matter due to the uncontroverted fact that the Epixtar's delisting was inevitable and that said delisting had no relationship with any alleged act or omission of the Defendants.

## ARGUMENT

### I.    CBIZ DID NOT TORTIOUSLY INTERFERE WITH MCCLAIN'S AUDITING ENGAGEMENT WITH EPIXTAR.

In Plaintiff's zeal to have this Court believe that CBIZ tortiously interfered with a business relationship then existing between Plaintiff and McClain, Plaintiff appears to misstate applicable law in the hope of finding  an advantage which will allow it to assert a non-existent right to summary judgment against CBIZ.

In its Motion, Plaintiff begins by asserting that the elements of a tortious interference cause of action are

> "(1) the existence of a business relationship ... (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage."

For this proposition, Plaintiff cites the case of *Ethan Allen Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814, (Fla. 1994).  However, this is an unjustifiable and inexcusable abridgment of the language of the case.  The full citation reads as follows:

> "(1) the existence of a business relationship ... (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage ***to the plaintiff as a result of the breach of the relationship*.**"

*Ethan Allen Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814, (Fla. 1994).  (emphasis added to demonstrate deletion).  This can only be attributable to the Plaintiff's desire to have this Court not consider the crucial issue of damage allegedly caused to the Plaintiff.  Indeed, proximate causation is an issue of liability, not an issue of damage, as the Court in the cited case explicitly recognizes.

Despite this unworthy attempt to "tailor" the law applicable to this case to suit its own needs, the fact is that summary judgment cannot lie here as there are multiple issues of both law and material fact which prevent such a finding as detailed below.

A.    THE RECORD EVIDENCE IN THIS CASE CREATES AN ISSUE OF MATERIAL FACT WHICH PREVENTS SUMMARY JUDGMENT FROM BEING ENTERED ON BEHALF OF THE PLAINTIFF AS TO PLAINTIFF'S COUNT FOR TORTIOUS INTERFERENCE AGAINST CBIZ

Contrary to the assertions in Epixtar's Motion, the Defendants submit that the record evidence in this case requires a finding that a material issue of fact exists regarding the cause of the resignation of McClain from the Epixtar engagement and that CBIZ withdrew from providing labor to McClain for the Epixtar engagement only after McClain had independently reached the decision to terminate the engagement for legally valid reasons.  In point of fact, the deposition testimony of the majority of the principles of McClain, who voted to resign from the engagement, reflect that CBIZ did not cause McClain to resign from the engagement. Rather, CBIZ merely acted as a resource and reference in response to requests for information and advice from McClain's members.

1.    SAUL REIBSTEIN'S TESTIMONY SUPPORTS THE DEFENDANTS' POSITION, NOT THAT OF THE PLAINTIFF

A full reading of the deposition testimony of CBIZ employee Saul Reibstein ("Reibstein"), selectively cited to by the Plaintiff in support of its Motion, confirms that

Epixtar's own wrongful conduct resulted in McClain's decision to resign. This wrongful conduct is described in McClain's letter to Epixtar's audit committee regarding the resignation and attached to McClain's response to Epixtar's form 8K. Additionally, the principals of McClain have provided in-depth deposition testimony regarding the decision making process followed by McClain in deciding to resign and refusing to prepare an opinion on the financial statements of the Plaintiff.

Plaintiff fails to make clear in its Motion that Reibstein testified that the alleged tortious interference (his instruction that CBIZ employees could not work on the Epixtar engagement) occurred after: (a) McClain had discussed potential resignation with Epixtar; and (b) Epixtar's counsel threatened McClain orally and in writing with litigation if an audit opinion were not issued, thereby irreparably damaging McClain's independence and necessitating the resignation under AICPA standards, even if the ethical issues with Epixtar's management could have been resolved.

In light of the foregoing alone, this Court should conclude that the arguments made by the Plaintiff in its Motion are flawed, and deny the Motion. However, testimony from members of McClain corroborates the testimony of Reibstein.

  2. **MCCLAIN MEMBER TESTIMONY CONFIRMS THE DEFENDANTS' POSITION**

The deposition testimony of McClain's managing member, Michael Desiato, and McClain members Stuart Block and Michael Sahr, the only witnesses with actual knowledge of McClain's internal decision making processes to provide record evidence, makes clear that McClain elected and chose to resign independent of any alleged demands made by CBIZ.

Plaintiff's Motion with respect to Count I of the Amended Complaint relies wholly upon a brief excerpt of the testimony of CBIZ's employee, Mr. Reibstein. In fact, the testimony

Plaintiff attempts to use to prove its claim was read into the record from a deposition transcript taken in an employment lawsuit between William Urban ("Urban"), a former defendant in this suit, and CBIZ. In essence, because in this other deposition, Reibstein comes to the independent conclusion that he was the one who stopped the audit, Epixtar attempts to disregard the testimony of every other member of McClain already deposed in this matter, all of whom state that they evaluated the opinions of CBIZ's employee's as advice and concluded independently that resignation was appropriate and, in point of fact, mandatory, under the circumstances.

In addition, Plaintiff neglects to provide the Court with the critical context regarding the remarks of Reibstein. During cross examination in the very same deposition selectively excerpted by the Plaintiff in support of the present Motion, Reibstein testified that his actions occurred only after Epixtar had threatened McClain with litigation if it did not provide an audit opinion. That testimony, in pertinent part, makes it clear that the decision to withdraw labor from McClain for the Epixtar engagement was made only after McClain had been threatened with litigation by Epixtar:

> 1.      Q. Do you remember plaintiff's counsel read some
> deposition testimony of yours from another case earlier today?
> A.   Yes.
> Q.   And do you recall your testimony in the deposition read by
> plaintiff's counsel wherein you testified you made the decision that
> no CBIZ employees could perform work on the Epixtar matter? Do
> you remember that?
> A.   Yes.
> Q.   Was that decision made after you learned of the threat by
> Epixtar of a lawsuit?
> A.   Yes.[1]

---

[1] Transcript of Deposition of Saul Reibstein dated 10/7/08 at pp 236-237, ln 16- ln 3

Case 08-01208-AJC    Doc 379    Filed 07/02/09    Page 6 of 23

Most critical to Plaintiff's arguments against CBIZ is the deposition testimony of Michael DeSiato, Stuart Block, and Michael Sahr, all of whom voted in favor of McClain's resignation from the Epixtar engagement. These men have all testified that McClain determined to resign from the Epixtar engagement independently of any purported directive from CBIZ.

Specifically, when asked "who was involved in making that decision [to resign] and how was it made," Michael DeSiato testified under oath that: "It was made by us, Bill Urban, myself, Mike Sahr, Stuart Block. We met and we had input from CBIZ who also was looking at the same facts we were looking at."[2]

Michael DeSiato continued to explain the process by which McClain arrived at its decision to resign from the Epixtar engagement, independently of any input or influence from CBIZ:

> . . . It was just that the company didn't have any system -- any control environment procedures for bringing this to us, which we would expect them to do. Anything that -- any significant matters and charges and problems with senior management like this should be brought to the attention of auditors and they did not do that.
>
> Q: Now, does this go to question of controls?
>
> A: Internal control and control environment. So our -- my concern and all of our concerns were if we didn't -- we weren't apprised of these things, what else was there that we weren't being apprised of. And that was concerning to us as auditors because we rely very heavily at times on representations made to us by management about events and transactions and they need to be forthcoming with us. And this was, in our view, a circumstance which seemed -- which showed us to and demonstrated to us that there was a faulty control environment in the lack of good internal controls that this information did not get to us. We had to find it.
>
> DeSiato Deposition, Pages 99 – 100, ln 11-ln 7.

---

2.      Transcript of Deposition of Michael DeSiato dated 10/2/08 at pp 159-160.

Continuing, Mr. DeSiato noted that:

> So my point is that that causes us as auditors to start questioning their forthcomingness and their -- and we start losing confidence in their representations. They don't have proper internal control procedures and control environment to identify things like this.
>
> * * *
>
> Well, I did hear conversations by Bill Urban and the auditor -- I mean, the manager on the job, Yin Law, that they were having a difficult time getting requested and required information to complete the audit.
>
> DeSiato Deposition, Pages 117 – 118, ln 7-ln 1.
>
> Well, when you start with this one particular circumstance and then you move to the 12b-25 situation, okay, you start building a cumulative case of things not being done properly, systems and internal controls not being followed, and clients making incomplete and misleading statements about their role and our role, it's -- your confidence in their ability to provide you with accurate and representations that you can rely upon becomes -- becomes compromised. So it wasn't something that just happened at one point in time. It was a cumulative effect of things.
>
> DeSiato Deposition, Page 121, ln 1-12.

Finally, as Mr. DeSiato states, the issues between McClain and Epixtar's Management could no longer be avoided:

> So we called a meeting from what I understood. There was a meeting called by Bill Urban and Mike Sahr, the two people who were running the two sides of this engagement, with bankruptcy counsel and management to discuss our intentions here and why we were where we were at and what the problems were and how we came to our conclusion at this point and, you know, during that meeting from what I understood, Michael Seese, the bankruptcy attorney, when he heard of our intention to possibly withdraw, went ahead and threatened to sue us if we were going to do so."
>
> . . . **we came to the conclusion** that based on what we knew and what we were seeing, the 12b25 being the last in the whole series of events, **that we can no longer rely on representations from management**. We didn't feel like they had the proper control

structure in place to allow us to properly prepare financial statements and we were at the point where we needed to talk to them about our intent to withdraw knowing that we had to get the bankruptcy court's approval, but we just wanted to go and talk to them about it and see possibly what they had to say and, you know, confronting them and talking about it." (emphasis added)

DeSiato Deposition, Pgs 159 – 162, ln 5-ln 3.

As the above testimony reflects, McClain's managing partners[3] engaged in meetings and discussions in order to determine the appropriate course to follow when it became clear to them that they could no longer rely on Epixtar's management to assist them, in a true and trustworthy manner, in the performance of their audit duties.

The deliberative nature of the process employed by McClain in reaching its decision was confirmed in the deposition testimony of McClain partner, Michael Sahr:

Well, number one, a concern of ours was that there were not procedures in place, controls, within the company that these things were not reported to us prior to us finding them out.

Until Bill [Urban] said he found these things, he was never told about them by the company. That was one thing."

Sahr Deposition, P. 47, ln 3-9.

**We didn't just knee jerk and say, well, that is it; we are done**. That is not what occurred. He [Urban] tried to get to the bottom of these things. And that is the way I recall it. He came back; he would give us progress reports at our meetings. And he took me to one meeting with him, but basically it was all Mr. Urban getting to the bottom of this. He was trying to understand these things. And he spent more time also trying to find out what went wrong with the controls and reporting requirements, because that was a surprise to him." (emphasis added)

Sahr Deposition, P. 50, ln 11-21.

---

3. Michael DeSiato, Michael Sahr, Stuart Block and William Urban were the partners of McClain and Company at the time the resignation decision was being reached.

Finally, when Sahr was asked "Did you hear whether anyone at CBIZ, Inc. told McClain, your other partners and directors that CBIZ employees could not work on this audit?" Mr. Sahr testified: "I was never told by anyone. It may have happened, but I would have no idea because I don't recall ever discussing it."[4]

Likewise, when Mr. Block was asked in deposition, "were there any other reasons, to your knowledge, that McClain withdrew from the Epixtar engagement apart – other than the conviction of the COO and the filing of the form for extension with the SEC," he stated:

> . . . Well, I would just only add, as I believe I have already stated a factor, which was the ability of the client to timely produce the records necessary for us to audit was certainly something that was considered, and I also believe that at the very end of these events when we—and I was not at the meeting, but I understood at the time that it occurred, that when we informed the Epixtar management that we intended to withdraw, and gave them the reasons why we wanted to withdraw, I was told that their response was basically to threaten a lawsuit and we discussed that particular event or that particular reaction by management, and I recall that particular event made it no longer any possibility of reconsidering, negotiating or discussing about what they might do to rectify and have us not resign from the account, but that at that point, as a matter of fairly clear professional ethics and standards, we had to withdraw, and that was it.[5]

When asked point blank, "Why did McClain withdraw?" Mr. Block did not equivocate:

> I would characterize it as a loss of confidence in our ability to trust the management of Epixtar and to be comfortable in performing the audit service.
>
> * * *
>
> Well, I know that my partners informed me of some of the goings on with respect to that engagement and ultimately there was

---

4        Transcript of Deposition of Michael Sahr dated 10/10/08 at pp 63-64, ln 23-ln 4.
5.        Transcript of Deposition of Stuart Block dated 9/24/08 at pp 37-38.ln16-24

a meeting to discuss, you know, whether we should continue as auditors and we made the decision to withdraw.[6]

The record evidence in this case establishes the following facts without contradiction:  a) the partners of McClain at the time McClain resigned from the Epixtar engagement were Michael DeSiato, Stuart Block, Michael Sahr, and Bill Urban; b) the majority of McClain's partners have not testified that Reibstein's alleged instruction regarding the use of CBIZ employees impacted their decision; c) Every McClain partner deposed to date testifies that the decision was made independently and after a notably deliberative process, including several meetings, d) CBIZ's professionals were consulted for advice; and e) Reibstein did not dictate a decision regarding the attest engagements of McClain.

The sum and substance of all of the above is to effectively rebut the Plaintiff's characterization of one portion of Reibstein's testimony regarding the reasons for McClain's withdrawal.  Plaintiff has characterized that portion of Reibstein's testimony as the central assertion of Epixtar's claimed right to summary judgment.  All of the above, when taken as a whole, establishes beyond any question that there is a genuine issue of material fact which prevents the Plaintiff from obtaining summary judgment on any theory it asserts.

However, this does not create any issue as to the Defendant, CBIZ's right to its summary judgment, as that is based not on assertions of fact, but on pure questions of law.  Plaintiff has entirely failed to establish by any means whatsoever that CBIZ had any intent to interfere with any relationship then existing between McClain and Plaintiff, but was, instead, acting in furtherance of its own financial interest, rendering its conduct not tortious under Florida law.

---

6        Id at p.20 ln 11-22.

**B.** **CBIZ HAD NO INTENT TO DAMAGE ANY BUSINESS RELATIONSHIP BETWEEN MCCLAIN AND ACTED IN ITS OWN FINANCIAL INTEREST, WHICH IT HAD THE RIGHT TO DO UNDER APPLICABLE LAW**

Under the law applicable to this case, Plaintiff must prove that CBIZ possessed both intent to damage the business relationship and a lack of justification to take the action which caused the damage. *Networkip, LLC v. Spread Enterprises, Inc.*, 922 So.2d 355 (3rd DCA, 2006). The difficulty for the Plaintiff in the present case is that it cannot demonstrate either of these required showings, as a matter of law.

In *Networkip*, the Plaintiff, Spread Enterprises, was a company engaged in the business of reselling telephone minutes through the use of prepaid phone cards. Networkip was a company which owned the minutes. Network entered into a contract with a third company, Infinity, to sell minutes to Infinity. Infinity then resold the minutes, pursuant to a contract with Spread. Spread resold the minutes at retail to end users.

Networkip's contract with Infinity provided that Networkip had the right to suspend performance to Infinity if Infinity fell behind on its payments to Networkip. This occurred and Network suspended service to Infinity, causing a disruption in the service to Spread's end users. Spread sued Networkip for tortious interference with its contract with Infinity.

The court reversed a trial court summary judgment granted in favor of Spread and entered, instead, summary judgment in favor of Networkip. The court stated:

> Protecting a company's own economic interest to reduce the risk of incurring further loss does not constitute intent to damage within the meaning of a cause of action for intentional interference with business relationship.

> Network cancelled the contract pursuant to its terms to prevent further financial loss. Therefore, Network's cancellation of the contract, as a matter of law, does not constitute the intent to damage necessary for Spread to maintain a cause of action for intentional interference with a business relationship.

11

*Networkip,* 922 So. 2d at 358

If this Court substitutes CBIZ for Networkip, McClain for Infinity and Epixtar for Spread, it will be clear that CBIZ is entitled to the same judgment, as a matter of law, which the Third District Court of Appeals awarded to Networkip.  Here, CBIZ had a contract with McClain to supply McClain with licensed accounting professionals to assist McClain in providing audit services such as in the Epixtar engagement.  While the supervision of these employees was the responsibility of McClain pursuant to the Administrative Services Agreement between it and CBIZ (to which Epixtar was not a party), they remained employees of CBIZ, compensated by CBIZ.  While CBIZ did not, and could not, supervise their day-to-day employment (the Administrative Services Agreement vested the day-to-day professional supervision of the CPA employees to McClain, as would be necessary under the AICPA rules), CBIZ had a legitimate business interest in assuring that said employees maintained their licenses to practice accounting in good standing, as if they did not, they would cease to have any value as professional employees to CBIZ.

As McClain continued to perform its work under the engagement with Plaintiff, it discovered several issues which would ultimately relate to McClain's ability to issue a final audit opinion for Plaintiff.  These issues included (a)  the fact that Plaintiff caused to be filed a Securities and Exchange Commission form 12B-25 which had material misrepresentations regarding the scope of work being performed by McClain, without consulting McClain nor obtaining McClain's approval of the document prior to its filing; and (b) the Chief Operating Officer of Epixtar, Bradley Yeater, had been accused of rape (which he ultimately pleaded guilty to in exchange for a reduced charge) yet Plaintiff refused to dismiss him from his position with Epixtar.  As a result of these discoveries McClain's confidence in Plaintiff's management was

undermined significantly.  , McClain ultimately reached a decision that it would need to resign from the Epixtar engagement  and so notified Plaintiff on April 10, 2006.  Thereafter, on April 11, 2006, Epixtar's bankruptcy counsel wrote to McClain and, essentially, catalogued some of the problems McClain was facing but threatened to sue McClain if it went ahead with its plan to withdraw from the engagement.  See letter from Michael Seese to William Urban dated April 11, 2006, attached hereto as Exhibit "A" to this Opposition.

The threat of litigation unequivocally and irrevocably compromised McClain's professional independence with regard to the engagement.  In fact, if McClain would have been in violation of AICPA ethical standards regarding independence had it continued the engagement in spite of the threats.  To find, as Plaintiff urges, that one could continue with an engagement, and in fact MUST continue with an engagement, regardless of the lack of independence after being threatened with litigation is untenable.  Such a conclusion would threaten the professional credibility of each and every accounting professional by mandating that they continue to work in furtherance of an engagement where professional independence was called into question.

Epixtar's own actions made the resignation from the engagement mandatory on the part of McClain.  Once this threat became known, CBIZ had no choice but to attempt to preserve the good standing of it's professional CBIZ employees which had been provided to McClain to work on the Epixtar engagement, by removing them from the engagement.  Thus CBIZ's motivation was to prevent financial loss to itself by ensuring that it's professional CPA employees were not being utilized in an engagement which might or could have threatened their employability as CPA professionals.

As in *Networkip* the outcome of this case is manifestly clear.  CBIZ is entitled to a summary judgment on Plaintiff's claim of tortious interference against it, as it acted in its own

financial interest (and in the interests of its employees) by removing them from the Epixtar engagement as soon as it became clear that their professional independence of the employees, working as "leased" employees of McClain, could be subject to professional criticism and censure, if not discipline, for working in an engagement where it became clear that their professional independence had been compromised.  CBIZ had no other choice.

Consequently, for the reasons and upon the legal authority set forth above, CBIZ had an appropriate, business-motivated reason to withhold staffing from McClain for the Epixtar engagement once the threat of litigation from Epixtar irreparably compromised McClain's requisite independence.  Therefore, CBIZ is not liable to Epixtar on any theory of tortious interference, as Epixtar failed to make the required ". . .  showing of <u>both</u> an intent to damage the business relationship <u>and</u> a lack of justification to take the action which caused the damage . . . ".  *Smith v. Emery Air Freight Corp.,* 512 So.2d 229 (Fla. 3d DCA 1987) (emphasis added).  Put another way, CBIZ is entitled to its own summary judgment, as a matter of law, as to the tortious interference count asserted by the Plaintiff.  *See Networkip*, 922 So.2d 355.

II.     **MCCLAIN DID NOT BREACH ITS CONTRACT WITH EPIXTAR AS ITS WITHDRAWAL FROM THE ENGAGEMENT WAS WHOLLY JUSTIFIED AND, IN FACT, REQUIRED.**

Professor Williston states in his noted treatise on Contracts:

> As a contract consists of a binding promise or set of promises, a breach of contract is a failure, without legal excuse, to perform any promise that forms the whole or part of a contract.

23 Williston on Contracts § 63:1 (4th ed.).  Florida law renders the determination of what constitutes a breach of contract a matter of law, while the determination as to whether or not the conduct allegedly giving rise to the breach is a question of fact for determination by the trier of fact.  *Gulf American Land Corporation v. Wain,* 166 So.2d 76 (Fla., 3rd DCA., 1964).

Under both of these well-stated and well-accepted principles of law, it is evident that

McClain did not breach its contract with Plaintiff.  The evidence in this case clearly demonstrates that McClain acted, at all times relevant and material, in accordance with applicable law and in the exercise of its own best judgment after having its administratively-mandated independence compromised by Epixtar as a result of Epixtar's unwarranted and unjustified threat of litigation against McClain for unspecified " . . . actions or inactions . . ." thereby requiring McClain to seek and obtain leave to resign from its engagement for Epixtar.

A.    THE PARTIES' UNDERTAKINGS UNDER THE LETTER OF ENGAGEMENT (THE "CONTRACT")

McClain's letter of engagement with Epixtar, dated January 11, 2006 and attached to this Opposition as Exhibit "B", sets forth the undertakings of both McClain and Epixtar in connection with the audit services to be provided by McClain to Epixtar.  Those undertakings, in pertinent part, were as follows:

McClain's Undertakings:

"The objective of our audit is the expression of an opinion about whether your financial statements are fairly presented, in all material respects, in conformity with U.S. generally accepted accounting principles.  Our audit will be conducted in accordance with the Standards of the Public Company Accounting Oversight Board (United States) and will include tests of your accounting records and procedures we consider necessary to enable us to express such an opinion.  If our opinion is other than unqualified, we will discuss the reasons with you in advance.  If, for any reason, we are unable to complete the audit or are unable to form or have not formed an opinion, we may decline to express an opinion of to issue a report as a result of this engagement."

Epixtar's Undertakings:

"You are responsible for making all financial records and related information available to us and for the accuracy and completeness of that information.  Your responsibilities include adjusting the financial statements to correct material misstatements and confirming to us in the management representation letter that the

effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

"You are responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us about all known or suspected fraud affecting the Company involving (a) management, (b) employees who have significant roles in internal control, and (c) others where the fraud could have a material effect on the financial statements.  Your responsibilities include informing us of your knowledge of any allegations of fraud or suspected fraud affecting the Company received in communications from employees, former employees, regulators or others.    In addition, you are responsible for identifying and ensuring that the entity complies with applicable laws and regulations."

**B.    INFORMATION LEARNED BY MCCLAIN DURING THE AUDIT PROCESS RELEVANT TO ITS DECISION TO WITHDRAW FROM THE ENGAGEMENT**

During the course of the audit, McClain came to learn many things about Epixtar, including, but in no way limited to, the following.

1.    On or about April 7, 2006, a Form 12B25 was prepared on behalf of Epixtar and filed with the Securities and Exchange Commission.  This form was not submitted to McClain for meaningful review, in fact, a copy of the form was provided minutes before the form was submitted and never reviewed by the engagement principal.  The form contained substantial errors and misrepresentations relevant to the audit which McClain was then performing.

2.    McClain came to learn that the Chief Operating Officer of Epixtar, one Bradley Yeater, had been arrested, and later plead guilty, in connection with a charge of felonious sexual assault which carried with the charge the possibility of substantial jail time.

**C.    MCCLAIN'S NOTIFICATION TO EPIXTAR OF ITS CONCERNS, PURSUANT TO THE CONTRACT AND EPIXTAR'S RESPONSE**

The two foregoing occurrences, in and of themselves, gave rise to concerns on the part of

McClain that they would not be able to provide an unqualified opinion regarding the financial statements of Epixtar, in that these issues gave rise to serious concerns regarding the credibility and integrity of Epixtar's management.

McClain raised these concerns with Epixtar, as it agreed to do in the letter of engagement ("If our opinion is other than unqualified, we will discuss the reasons with you in advance"). In a telephone conference with Epixtar's management on April 10, 2006, McClain informed Epixtar that it intended to resign from the engagement based upon these concerns. Subsequently, McClain received a letter from Epixtar's bankruptcy counsel on April 11, 2009. In that letter, Epixtar's counsel assured McClain in no uncertain terms that " . . . Epixtar and its affiliates intend to hold McClain responsible, and will vigorously pursue any and all legal and equitable actions and Claims against McClain, as a result of any damages or other adverse consequences that Epixtar and / or its affiliates may experience, suffer or incur as a result of McClain's actions or inactions." It must be noted that this threat of litigation was not based only on McClain's disclosed intention to seek resignation from the Epixtar engagement, but based on " . . . McClain's actions or inactions . . .", leaving it to McClain to interpret what those actions or inactions might be.

> **D.    EPIXTAR'S REPRESENTATIONS TO THIS COURT AT THE TIME OF SIGNING THE ORDER PERMITTING THE MCCLAIN RESIGNATION FROM THE EPIXTAR ENGAGEMENT.**

On April 24, 2006, this Court entered an order permitting McClain to resign from the Epixtar engagement. When the order was presented, counsel for Epixtar made the following representation to the Court:

> "MR. SEESE:  At the end of the day, Your Honor, it became readily clear that, while - - and I'm just thinking out loud on the record, but part of the logic behind this was, while we think that

you could compel them to remain in the engagement, we don't think that they could be compelled to issue an unqualified opinion, which doesn't get us to where we want to be, even though we think that an unqualified opinion is appropriate.

"We have new auditors.  The company has spent the last week interviewing new auditors.  I spoke with them about an hour ago, and they have a new auditor who is prepared to come in.  It is a reputable local firm.  They need ten days to run their due diligence and present it to the committee, but they don't foresee any problems at this point in time.

So it's just a matter of trying to get this done in a manner which will, hopefully, permit us to avoid being delisted."[7]

E.    **AS A RESULT OF ALL OF THE ABOVE AND FOREGOING, MCCLAIN'S RESIGNATION FROM THE EPIXTAR ENGAGEMENTS WAS WARRANTED AND JUSTIFIED AND, AS SUCH, DID NOT CONSTITUTE A BREACH OF ITS CONTRACT WITH EPIXTAR.**

The AICPA Code of Conduct, under which McClain operated while performing its audit responsibilities for Epixtar, sets forth the ramifications of the threat, by a client, of litigation against an audit firm, on the independence of the audit firm in conducting the audit and the remedies available to the audit firm when such a threat is made.

**AICPA Code of Conduct**

**Section 101.08**

**Interpretation 101-6—The effect of actual or threatened litigation on independence.**  In some circumstances, <u>**independence may be considered to be impaired as a result of litigation or the expressed intention to commence litigation**</u> as discussed below.

***Litigation between client and member***

The relationship between the management of the client and a covered member must be characterized by complete candor and full disclosure regarding all aspects of the client's business

_____

7    Transcript of Hearing before Judge Cristol dated 4.24.06

operations. In addition, there must be an absence of bias on the part of the covered member so that he or she can exercise professional judgment on the financial reporting decisions made by the management. When the present management of a client company commences, or expresses an intention to commence, legal action against a covered member, the covered member and the client's management may be placed in adversarial positions in which the management's willingness to make complete disclosures and the covered member's objectivity may be affected by self-interest.

For the reasons outlined above, **independence may be impaired whenever the covered member and the covered member's client or its management are in threatened or actual positions of material adverse interests by reason of threatened or actual litigation.** Because of the complexity and diversity of the situations of adverse interests which may arise, however, it is difficult to prescribe precise points at which independence may be impaired. **The following criteria are offered as guidelines**:

. . . . . . . . . .

3. **An expressed intention by the present management to commence litigation against the covered member alleging deficiencies in audit work for the client would be considered to impair independence if the auditor concludes that it is probable that such a claim will be filed.**

. . . . . . . . . .

*Effects of impairment of independence*

If the covered member believes that the circumstances would lead a reasonable person having knowledge of the facts to conclude that the actual or intended litigation poses an unacceptable threat to independence, **the covered member should either (a) disengage himself or herself,** or (b) disclaim an opinion because of lack of independence. **Such disengagement may take the form of resignation or cessation of any attest engagement then in progress** . . . .

AICPA Code of Conduct  Section 101.08 (emphasis added).

F.   PLAINTIFF'S ASSERTED POSITION SEEKING SUMMARY JUDGMENT IS DEFECTIVE AND CANNOT SUPPORT THE RELIEF IT SEEKS

The Plaintiff attempts to assert, through the testimony of Reibstein, that McClain stopped

work on the Epixtar audit because CBIZ removed its personnel who had been assisting with the audit. (Motion, P. 9)

In point of fact, and not disclosed by the Plaintiff, McClain continued to perform its duties pursuant to the engagement letter through and including April 11, 2006, at which time Epixtar advised McClain, in writing, of its intentions and threatened " . . . to hold McClain responsible and vigorously pursue any and all legal and equitable actions and claims against McClain as a result of any such damages or other adverse consequences that Epixtar and / or its affiliates may experience, suffer or incur as a result of McClain's actions or inactions."

Once the above occurred, McClain, pursuant to the State of Florida Regulations applicable to it in connection with its practice of public accountancy, justifiably sought leave to resign from the Epixtar engagement.

Further, Plaintiff claims that the resignation was violative of McClain's own policies, which Plaintiff states " . . . required that McClain's engagement principal, [William] Urban, decide matters of withdrawal."

However, the Plaintiff fails to either state or establish through record evidence that Urban did not, in fact, make or participate in the determination(s) which resulted in McClain's seeking and obtaining authority to resign from the Epixtar engagement. Thus, Plaintiff fails to establish any violation of McClain's own policies.

Finally, the above-cited section of the AICPA Code of Conduct governs the practice of Certified Public Accountants in Florida as it has been enacted by the Florida Department of Business and Professional Regulation – Board of Accountancy (Rule 61H1-21.001 and incorporated publication "Standards for Determining Independence in the Practice of Public Accountancy for CPAs Practicing Public Accountancy in the State of Florida"), pursuant to

rulemaking authority granted by the Florida Legislature and, as such, is possessed of the force of law.

In light of all of the above and foregoing, it can only be said that McClain conducted itself in strict compliance with the prescribed regulatory scheme under which it practiced Public Accountancy in its engagement with Epixtar and thus, was entirely justified in its resignation from that engagement ass a matter of law.

## CONCLUSION

**WHEREFORE**, for all of the foregoing reasons, the Defendants respectfully request this Court to enter an order (i) denying Plaintiff's Motion for Partial Summary Judgment in whole; (ii) grant CBIZ summary judgment on Plaintiff's asserted claim for tortious interference as a matter of law; and (iii) granting such other and further relief as this Court may deem just and equitable under the facts and circumstance here present.

Dated:  July 2, 2009
Boca Raton, FL

SHENDELL & POLLOCK, P.L.
*Attorneys for Defendants*

One Park Place

621 N.W. 53rd Street, Suite 310

Boca Raton, Florida 33487

Telephone:    561/241-2323
Facsimile:    561/241-2330
Email:        gary@shendellpollock.com
              ken@shendellpollock.com

By:  _/s/ Kenneth S. Pollock_____
   Gary R. Shendell
   Florida Bar No. 0964440
   Kenneth S. Pollock
   Florida Bar No: 0069558

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, this 23rd day of June, 2009. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:    /s/    Kenneth S. Pollock

Kenneth S. Pollock

SERVICE LIST

| Norman A. Moscowitz, Esq.<br>Jane E. Moscowitz, Esq.<br>Moscowitz & Moscowitz, P.A.<br>Mellon Financial Center<br>1111 Brickell Avenue, Suite 2050<br>Miami, FL 33131<br>VIA CM/ECF | Samuel S. Lewis, Esq.<br>Marlow Connell, et al.<br>4000 Ponce De Leon Blvd, Suite 570<br>Coral Gables, FL  33146<br>VIA ELECTRONIC MAIL |
|---|---|
| Jerry M. Markowitz, Esq.<br>Ross. R. Hartog, Esq.<br>Markowitz, Davis Ringel & Trussy, P.A.<br>9130 S. Dadeland Blvd., Ste. 1225<br>Miami, Florida  33156<br>VIA CM/ECF | |

W:\Files\McClain and Company, LC\PLEAD- D's Opposition to P's MSJ.doc