UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI  DIVISION
www.flsb.uscourts.gov

In re

EPIXTAR CORP.,

Debtor.

_____/

EPIXTAR CORP.,

Plaintiff,

v.

MCCLAIN & COMPANY, L.C.,
and CBIZ, INC.,

Defendants.

_____/

CASE NOS.  05-42040-BKC-AJC through
05-42049-BKC-AJC
(Jointly Administered)

CHAPTER 11

ADV. No.  08-01208-AJC

### EPIXTAR'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS AND COUNTERSTATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Epixtar Corp., pursuant to Fed.R.Civ. P. 56, hereby submits its Response to

Defendants' Statement of Material Facts (DE 345-1) and Counterstatement of Material Facts in

Opposition To Defendants' Motion for Summary Judgment.[1]

1-12.  These paragraphs selectively recite company history that is not material to the

issues raised by the Defendants' Motion for Summary Judgment and appear to be here solely in

---

[1] Paragraphs in this document correspond to the paragraph numbers of the Defendants' Statement of Material Facts in Support of Defendants' Motion for Summary Judgment. (DE 345-1) In addition, in opposition to Defendants' Statement of Material Facts, Epixtar incorporates by reference its Statement of Material Facts filed together with its Motion For Partial Summary Judgment (DE 326.)

an effort to make the company look bad.  It should be noted that much of  the material cited is derived from public SEC filings available to Defendants before they undertook the Epixtar engagement.  While paragraph 7 notes that Epixtar's 2002 10-K showed a net loss for the year, it fails also to note that the 2003 Form 10-K showed net income of $4.4 million.  At paragraph 8, Defendants mischaracterize the FTC action against Epixtar, which Epixtar settled a month after the case was brought without any admission or finding of wrongdoing.  As Epixtar stated in its 2004 Form 10-K filing, "The [Stipulated Final Judgment] specifically noted that there was no finding of wrongdoing on [Epixtar'] part."  (See Stipulated Final Judgment, ¶ 11. PX 123.)

13.   The Defendants cite an "Internal Control Memorandum" prepared by Epixtar's prior auditor Rachlin and Cohen ("Rachlin"), which noted certain internal control deficiencies. Without citation to the record, Defendants claim these concerns were concealed from McClain.[2] In fact, the claim is untrue.  As William Urban's notes of his telephone call with the Rachlin auditor show (Attached to his declaration), at the time he began the Epixtar engagement he was told about "prior internal control weaknesses." (Declaration, ¶ 2, PX 114.)   It should also be noted that Rachlin did not withdraw from its engagement with Epixtar because of these deficiencies or any other issue it learned of in its audit and issued an opinion on Epixtar's financial statements for 2004.  (See Epixtar's 2004 10-K.).  Moreover,  Rachlin actively sought to continue its representation of Epixtar during the bankruptcy and only withdrew when it determined that its prior bills would not be deemed an administrative expense of the bankruptcy. (Lamplough Deposition, pp. 26 - 27.)

14.   This description of Epixtar's acquisition of Yeater's company in 2004, taken from

_____

[2] This memorandum, which Defendants state is Exhibit P to their Motion, but is not, notes on its face that the information contained within was conveyed verbally to Epixtar's audit committee.

the transaction documents is correct, but irrelevant and immaterial to this motion.

15.  As Defendants acknowledge (Defendants' Statement Of Material Facts, p. 6, n.20), Martin Miller, Epixtar's CEO, testified that Epixtar was unaware of Yeater's criminal conviction until notified by McClain.  Yeater's claim that Ricardo Sablon told him that Epixtar was monitoring his communications and knew about his criminal case is hearsay.  More important, Mr. Sablon in his declaration (PX 120) directly contradicts Yeater's claim, denying that Epixtar had been monitoring Yeater.

16.  As stated above, Epixtar did not know in November, 2004, about Yeater's criminal case.[3]  Moreover, Yeater testified that he concealed it from Epixtar. **(**Yeater deposition, pp. 165 - 167.)

17.  This statement from Epixtar's 2004 10-K as the operating results for 2004 is correct, but irrelevant and immaterial.

18 - 20.  Defendants' claim that Epixtar concealed the Todd Fisch matter  from McClain is false.[4]  It was properly disclosed to all of its auditors.  First, as William Urban states in his declaration, with reference to the notes of his conversation with the Rachlin auditor, "The notes indicate that Ms. Lamplough told me . . . , *inter alia*, about improper American Express Card

---

[3]  As Michael DeSiato testified:

> Q.  Did Epixtar say they were unaware of Yeater's case?
> A.  Yeah, they did
> Q.  Did you have any reason not to believe that?
> A.  No.

(Deposition 1, p.145.)

[4]  Their account of the facts relating to Fisch is also, in part, false.  For example, there is no citation to the assertion that Fisch was an "associate of Stanley Myatt and Martin Miller (Epixtar officers)," nor could there be, because it is a meaningless assertion like many others in this pleading, meant only as a slur.

usage by a former member of management." (PX 114, Declaration, ¶ 2.)  Second, Epixtar

properly disclosed this matter in its Form 10-Q filing, dated June 30, 2005.  (See Form 10-Q, for

quarter ending June 30, 2005, Item 4. PX 124.)  Rachlin specifically reviewed this disclosure and

determined it was appropriate.  As it states in its memo, "Identified Fraud Risks and Internal

Control Deficiencies, Quarter Ended June 30, 2005, "Rachlin reviewed the Company's

disclosures included in the Form 10Q regarding material weaknesses in internal control and

believe that they are appropriate." (PX 125.)  Third, Epixtar disclosed the matter, again, to

Morrison Brown, McClain's successor.  As Morrison Brown's "Fraud Risk Information Form"

states:

> Mr. Miller noted that the previous President, Todd Fisch, was issued an American
> Express corporate card and abusively charged personal expenses through the corporate
> credit card.  These expenses were deducted from his payroll so litigation was not deemed
> necessary.  Mr. Miller noted that Mr. Fisch had already been terminated when the
> personal expenditures were found.  The company decided to terminate all corporate cards
> to ensure this does not occur in the future.

("Fraud Risk Information Form, p.3, PX 126.)  MBAF did not withdraw upon receiving this

information and in fact, except for a going concern qualification, issued a clean opinion.

21.  The allegations relating to the Laurus transaction are correct, although irrelevant and

immaterial.  Srinivas was terminated after management discovered his misconduct. (Greenman

Deposition, pp. 87 - 88.)

22.  The grand jury subpoena is another red herring.  In August 2005, Rachlin received a

document subpoena from a grand jury requesting documents relating to Epixtar.  Once the

documents were produced pursuant to the subpoena, Rachlin heard nothing further about the

investigation and had no further concerns regarding management arising from it.  (Lamplough

deposition, pp. 95 - 96.)  The subpoena does not indicate that Epixtar is the subject of the

investigation.  There is no indication that Rachlin ever told Epixtar about the subpoena.  Indeed,

4

**MOSCOWITZ & MOSCOWITZ, P.A.**

Mellon Financial Center • 1111 Brickell Avenue Suite 2050 Miami, Florida 33131 • Telephone 305.379.8300 • Facsimile 305.379.4404

Martin Miller testified that he was unaware of the subpoena or any FBI investigation relating to Epixtar until he heard about it in Irving Greenman's deposition.

> Q. Are you aware that the company was at one point in time investigated by the FBI?
> \* \* \* \*
> A. When I heard that question [at Greenman's deposition in this proceeding] it became the first time I was aware of anything. . . . I have no independent knowledge that the FBI investigated Epixtar. Nobody from the FBI or any other agency ever discussed Epixtar with me and I have no reason to believe there was an investigation – if you tell me there was one I have no reason to doubt you, but I don't know of any.

(Miller Deposition, vol. II, p. 88.)

23-25. These paragraphs, which deal with Epixtar's 2005 SEC filings, its bankruptcy filing and 2005 NASDAQ issues are not material to the issue of whether McClain wrongfully withdrew from the Epixtar engagement. Regarding Epixtar's 10-Q filings, they were non-compliant because they were filed without auditor review by Rachlin. Rachlin would not review them due to non-payment. Martin Miller testified that he made the judgment that it was better to file the Q's, without auditor review, than not file at all. (Deposition, February 12, 2008, vol. II, p. 11.) As stated below, *infra*, ¶ 30, on or about January 11, 2006, McClain did the review and an appropriate filing was done, so that Epixtar's filings were compliant with SEC and NASDAQ requirements. (See Epixtar's Application For Authority To Retain McClain, filed February 10, 2006, DE 229.)

26-28. These statements, which deal with the circumstances of McClain's retention, while incomplete, are correct.

29. Defendants' statement that Mr. Greenman stated that he did not have many of the documents requested and failed to provide McClain with Rachlin's correspondence to Epixtar is unsupported by the cited testimony. Mr. Greenman testified that he did not recall whether he told McClain about the internal control issues identified by Rachlin. As William Urban's notes of his

**MOSCOWITZ & MOSCOWITZ, P.A.**
Mellon Financial Center • 1111 Brickell Avenue Suite 2050 Miami, Florida 33131 • Telephone 305.379.8300 • Facsimile 305.379.4404

conversation with his Rachlin predecessor show, these matters were disclosed to him directly by Rachlin.  (See Urban Declaration, PX 114.)

30.  This statement is essentially correct.  On January 11, 2006, McClain completed its review of the outstanding form 10Q for the period ending September 30, 2005 and stated that, except for a "going concern" qualification, it saw nothing in the third quarter financial statement that required modification. (McClain's "Independent Accountant's Report, January 11, 2006, PX 127.)

31-36.  Defendants again mischaracterize the events regarding Bradley Yeater.  It is undisputed that Epixtar did a background check on Yeater when he was hired, which was several months prior to his arrest.  None of the Defendants' witnesses has suggested what more Epixtar should have done, except that it should have done something.  None of them has pointed to any requirement for any additional procedures or additional background checks.  Aram Kostoglian, a partner at MHM  was consulted by CBIZ and McClain concerning the Yeater matter.  After stating that Epixtar should have known about the Yeater conviction, "because it's a material thing," Mr. Kostoglian was asked:

> Q.  Well, as an auditor, what would your view be? What should they have done?
> A.  I don't know.
> Q.  You have no idea?
> A.  No.

(Deposition, pp. 147 - 148.)  Defendant Michael DeSiato, while asserting that Epixtar should have been doing background checks continually, conceded that there is no rule concerning how often background checks of management should be done and that there is "nothing" in McClain's guidelines, or in the auditing guidelines for public companies on that issue. (Deposition, October 2, 2008, pp. 102 - 103.)  Moreover, Mr. DeSiato acknowledged at the time that he did not regard the Yeater criminal case as material.  On February 22, 2006, he wrote to Mr. Reibstein that

MOSCOWITZ & MOSCOWITZ, P.A.

Mellon Financial Center • 1111 Brickell Avenue Suite 2050 Miami, Florida 33131 • Telephone 305.379.8300 • Facsimile 305.379.4404

"[McClain] did the background checks and there is nothing that is an issue." (Desiato e-mail, February 22, 2006, Exhibit 82.) McClain partner Michael Sahr similarly argued that Epixtar should have known about Yeater. When asked what else Epixtar should have done, besides the initial background check which it did, he answered "I don't know. I am not familiar with what they [other procedures] are." (Deposition, at p.129.) At the same time, there is no indication that Mr. Sahr was troubled by the Yeater matter at the time. To the contrary, as late as April 5th, he sent an e-mail to Mr. Reibstein which stated only, "Saul, Martin Miller told me that neither the charges nor the plea will in any way effect [sic] his job performance which has been remarkable." (PX 121.) This is consistent with Mr. Urban's testimony that "neither DeSiato, Sahr nor [I] wanted to resign." (PX 114, ¶ 8.)

As to Epixtar's decision to retain Yeater as COO after McClain brought the matter to its attention, Martin Miller has testified Epixtar undertook an internal inquiry, consulted counsel, and consulted with the other parties in the bankruptcy. All those consulted agreed that while Yeater's conduct was reprehensible, it was "less harmful to the Company to retain him than to fire him." (Deposition, February 12, 2009, p. 81.) Significantly, Michael DeSiato agreed that he knew that Epixtar was undertaking a review of the matter in response to McClain notification and that, following that process (he denied knowing specifics about it), Epixtar was in a better position than McClain to decide whether to retain Yeater or to fire him.

> Q. All right. Now [Epixtar] reported back to you that after these consultations it was agreed that they were going to keep [Yeater] on as COO, correct?
> A. Yes.
>                         *    *    *    *    *
> Q. All right. Now, would you agree that they were in a better position than you, McClain, to make that determination?
> A. Yes.

(Deposition, October 2, 2008, pp. 150 - 151.)

**Moscowitz & Moscowitz, P.A.**
Mellon Financial Center • 1111 Brickell Avenue Suite 2050 Miami, Florida 33131 • Telephone 305.379.8300 • Facsimile 305.379.4404

Defendants also allege that Epixtar knew about Yeater's conviction and concealed it from McClain. This is based on Bradley Yeater's deposition testimony that while he concealed this information from Epixtar, Ricardo Sablon, Epixtar's chief information officer, later told him that he was monitoring his e-mails and knew about his criminal conviction in 2005. However, Mr. Sablon in his Declaration (PX 120) denies he knew this information before Epixtar learned of it from McClain or and that he told Mr. Yeater that he did.

38. This statement regarding the date and contents of the Form 12b-25 filing is correct. However, whether the misstatement is "material," is an issue of fact which Epixtar disputes.[5] Also, there is no evidence to support the Defendants' characterization of this misstatement as a "misrepresentation," *i.e.*, a misstatement which was made intentionally, and Epixtar disputes that claim. Indeed, as soon as it was brought to its attention, Epixtar offered to correct the statement publicly. As Epixtar stated in its 8-K filing regarding McClain's withdrawal, on April 24, 2006, "With regard to the erroneous Form 12b-25, when the Company was apprised of its error by McClain, the Company acknowledged that it erred and offered to immediately correct the filing."

39-42. McClain claims and, in fact, told this Court that it withdrew from the audit of Epixtar because of Yeater, the Form 12b-25, and then because of a supposed threat by Michael Seese to bring litigation against it. Epixtar contends that these reasons are insufficient. But more important, they are untrue. The Defendants concealed from Epixtar and the Court the real reasons for McClain's withdrawal. As Epixtar has shown in its Motion for Partial Summary Judgment and Statement of Material Facts (¶¶ 33 - 46) (DE 326), McClain stopped its audit and moved to withdraw from the Epixtar engagement because Defendant CBIZ refused to permit

---

[5] Whether a false statement is "material" under the securities laws is a "fact specific" determination. See, *Basic, Inc. v. Levinson*, 485 U.S. 224, 238 (1988)(". . . materiality is something to be determined on the basis of the particular facts of each case.")

CBIZ employees to work on the audit.  McClain's staff was all leased to it by CBIZ.  Therefore, the audit work could not go forward.  The declaration of William Urban (PX 114), deposition testimony by him (PX 122) and the testimony by Saul Reibstein, who was the East Region Managing Director of CBIZ show that CBIZ made the decision to shed the Epixtar representation and brought it about by forbidding its employees to work on the audit.

Thus, the evidence shows as follows:

It was Reibstein's decision that CBIZ's employees would be pulled off the Epixtar audit.  On May 17, 2007, Reibstein testified as follows in a deposition taken in a lawsuit brought by William Urban against CBIZ:

> Q.  So you prohibited CBIZ employees from performing attest services for [Epixtar]?
> A.  I prohibited CBIZ employees from performing any service to that client under the administrative service agreement and under the direct engagement request for that client.

(Reibstein Depo. 1, pp. 36 - 39, Exhibit 95.)

The decision was Reibstein's alone, and as Reibstein testified, it was his decision which stopped the audit.

> Q.  You were the person that actually stopped the engagement, yes?
> A.  Yes.

*   *   *   *

> Q.  Well, you stopped the engagement and were the reason why the services were never completed.  You told the Miami office that they couldn't use staff to complete that engagement, correct?
> A.  Yes.
> Q.  So to the extent that there's liability arising out of that, it's your fault?  I mean, you made that decision, correct?
> A.  Indeed.

(Reibstein Depo. 1, pp. 44 - 45.)

9

**Moscowitz & Moscowitz, P.A.**

Mellon Financial Center • 1111 Brickell Avenue Suite 2050 Miami, Florida 33131 • Telephone 305.379.8300 • Facsimile 305.379.4404

Reibstein's testimony is mirrored by the testimony of William Urban, the McClain partner who was primarily responsible for the Epixtar audit.  Urban testified in his own proceeding against CBIZ, McClain, DeSiato and others, as follows:

> Q.  . . . Now, did you explain to either Mr. or Mrs. Moskowitz [sic] the reason for why McClain disengaged from Epixtar?
> A.  Yes.
> Q.  And what did you tell them?
> A.  That McClain was instructed by Mr. Saul Reibstein that McClain could not staff the engagement with CBIZ employees, and it left McClain no choice but to disengage Epixtar.
> Q.  Anything else?
> A.  That was the sole reason that McClain disengaged.

(Urban Deposition, p. 195, PX 122.)

In his declaration, Urban similarly testified that McClain withdrew because of Reibstein's decision.

> On approximately April 7 or 8 (my best recollection is that it was in the afternoon on a weekday toward the end of that week), I participated in a conference call with Reibstein, DeSiato, Sahr, and at least one representative of MHM.  It was during that call that Reibstein informed us that he would not permit CBIZ employees to work any longer on the Epixtar engagement.  Neither DeSiato, Sahr nor I wanted McClain to resign.  However, as McClain leased all its principals, employees and other administrative resources from CBIZ, that made it impossible for McClain to continue with the audit and required McClain to resign.

(Urban Declaration, PX 114, ¶ 8.)

The decision to forbid the use of CBIZ employees on the audit was made before any supposed threat by Epixtar's bankruptcy counsel.  McClain filed its motion to withdraw on April 11th, the same day Epixtar's counsel wrote the letter which Defendants contend was a "threat" of litigation.  (The letter is not cited in the motion as a ground for withdrawal.  It was not.  It was an afterthought.)  Defendants admit in their answer to the amended complaint that the day before, " . . . on April 10, 2006, in a conference call between Epixtar and McClain, McClain discussed several concerns and notified Epixtar that *McClain intended to withdraw from its engagement* .

MOSCOWITZ & MOSCOWITZ, P.A.
Mellon Financial Center • 1111 Brickell Avenue Suite 2050 Miami, Florida 33131 • Telephone 305.379.8300 • Facsimile 305.379.4404

**. . ."** (Answer, DE 310, paragraph 48.  Emphasis added.)  Reibstein further testified that he gave

his directive **before** McClain filed its motion to withdraw.  As he testified:

> Q. So after you prohibited any work for that client, that was the end of it, there was no
> more work performed by - for that client, correct?
> A. Well it wasn't that easy.  Epixtar was, as I recall operating under Chapter 11 of the
> Federal Bankruptcy Code, and therefore there was a process that required bankruptcy
> court approval for the work to be discontinued; for work in process to be discontinued.
> Q. Okay, **so after you prohibited the work, there was a process where they had to
> apply to the court to get out of the assignment, correct?**
> A. **Yes.**

(Deposition, pp. 40 - 41.  Emphasis added.)  Reibstein's testimony here is again corroborated by

Mr. Urban's declaration, as quoted above, that Reibstein's order was the reason McClain filed its

motion to withdraw.

      This time sequence is consistent with the testimony of Yin Law, McClain's manager on

the Epixtar audit, that she stopped working on the audit on April 8th, a Saturday, after receiving a

call from Mr. Urban.  (Deposition, at pp. 30 - 31.)  Yin Law's testimony is also corroborated by

Albert Molina, who testified that the McClain auditors did not show up at Epixtar on Monday,

which was April 10th.  (Molina Deposition,  p. 68.)  Her testimony is further corroborated by Mr.

Urban's declaration that after receiving the directive from Reibstein, he called Yin Law and told

her that work on the Epixtar engagement was to stop.  (Declaration, ¶ 9.)

      Finally, Defendants' own witnesses contradict their argument that Reibstein gave

McClain an order to withdraw from the audit after the motion was filed.  Michael Sahr, a

McClain partner, testified that Reibstein never gave such an order.

> Q.  Before the meeting with Mr. Seese that you just described Saul Reibstein told you,
> McClain, that no CBIZ employees could work on that audit, correct?
> A.  No.
> Q.  He did not?
> A.  I never heard it.

Q. You never hear that from anyone?

A. The only thing I heard from Saul Reibstein, "Okay, resign."

*    *    *    *

Q.  Did Mr. Reibstein tell McClain that no CBIZ employees could work on the Epixtar audit?

*    *    *    *

A.  I was not aware of him *ever* saying that.

(Sahr deposition, p.154.  Emphasis added.)  Defendant Michael DeSiato, then McClain's co-

managing principal, had no recollection of Reibstein doing or saying anything which affected

McClain's ability to go on working on the audit.

Q.  Did he say or do anything which would have made it extremely difficult for McClain to continue with the engagement?

*    *    *    *    *

A.  I don't recall him say anything which made it difficult for us to continue.

(DeSiato deposition 1, pp. 172 - 173.)

Moreover, the Defendants cannot rely on Stuart Block's testimony to support their motion

for summary judgment, as it states on its face that it is hearsay.  ("I was not at the meeting. . . . I

was told that." Defendants' Statement of Material Facts, ¶ 40).

43.  The Defendants imply that there were other reasons beyond what they told the Court

for their withdrawal.  They state that "much of the reasoning for the withdrawal was not set down

in writing so as to not create a record that would damage Epixtar's efforts to retain a successor

auditor."  However, that is incorrect.  The only two reasons they gave Epixtar and the Court were

the retention of Yeater and the filing of the erroneous Form 12b-25 and, additionally on the day

of the hearing, the alleged "threat" of litigation by Michael Seese, Epixtar's bankruptcy counsel.

In support of that argument that there were other undisclosed reasons, the Defendants  cite to a

portion of the hearing in which Seese stated:

In light of the motion, it may be difficult to find a replacement auditor because of these couple of statements that appear in Paragraphs 10 and 11.  Frankly, Your Honor, when a draft of that motion was circulated, I sent it over to counsel for the committee.  We

**MOSCOWITZ & MOSCOWITZ, P.A.**

looked at it.  We got counsel for McClain on the phone and said take this stuff out.  It's not true.  It's prejudicial.  To his credit, they did take some of the stuff out, but some of it remained.  They had notice that this stuff was prejudicial to us and could cause us problems."

(Hearing transcript, April 13, 2006, p. 38, PX 116.)  However, Mr. Seese was referring to the agreement by Defendants' counsel to leave out of the motion discussion of the specific facts of Yeater's criminal sexual offense.  In addition to the claim about the inaccurate Form 12b-25, which the Defendants' motion discusses in detail, in referring to the Yeater issue as an additional reason for McClain's "loss of confidence," the motion only states ". . . circumstances surrounding the Debtors' continued retention of certain Senior Management." (Motion. ¶ 11.).  This is corroborated by statements to the Court by McClain and CBIZ's counsel in the same hearing.  Later in the hearing the Court asks defense counsel why the issue of Yeater's criminal misconduct is not described in the motion.  Defense counsel explains that he was cryptic about Yeater's conduct at Mr. Seese's request.

> We don't talk directly about the act.  Mr. Seese asked me to not refer.
> We talked about the conduct of a certain member of senior management, [paragraph] number 11 [of the motion], at the request of Mr. Seese.  It's sort of disingenuous that Mr. Seese tells the Court we have not been specific when he and I both agreed . . .

(Hearing transcript, at p.41.)

44.  This is an incomplete account of the terms of the agreed order.  The agreed order which resulted from the mediation permitted this lawsuit and reserved jurisdiction in this Court.  As it states, in relevant part:

*     *     *     *     *

> (4) Nothing in this Order shall be deemed a finding of fact or conclusion of law as to any allegation in contained in the Motion or in the response filed by the Debtors.
> 5) Nothing in this Order shall be deemed a waiver of any claim, cause of action or defense that either party has or possesses against the other, and **all such claims, causes of action and defenses are preserved.**

MOSCOWITZ & MOSCOWITZ, P.A.
Mellon Financial Center • 1111 Brickell Avenue Suite 2050 Miami, Florida 33131 • Telephone 305.379.8300 • Facsimile 305.379.4404

6) **The Court reserves jurisdiction to interpret and enforce the terms and conditions of this Order.**

(Epixtar Bankruptcy docket, DE 318.  Emphasis added.)

45.  It is correct that Epixtar retained Morrison Brown to complete the audit after McClain's resignation and that Messrs. Miller and Greenman signed the management representation letter.

46.  This statement is incorrect and is a legal argument which Epixtar replies to in its Response to the Defendants' summary judgment motion.  (See, Epixtar's Response, Section III.) The statement in the Morrison Brown representation letter that Epixtar was unable to file its 10-K because Rachlin's refusal to agree to inclusion of its 2003 and 2004 audits in the 2005 filing is not inconsistent with Epixtar's allegation that McClain is liable for the delisting and the damages that follow from it.  As Mr. Miller explains in his declaration (PX 115), Rachlin's refusal was only the final and most immediate cause for Epixtar's failure to file.  Epixtar was unable to respond to that problem only because it had run out of time.  It was, of course, put in that position by McClain's resignation.  That sequence of events was well-known at the time and, accordingly, there was no need to recount it in its representation letter.[6]  As Martin Miller states in his declaration, at the time McClain moved to withdraw, Epixtar warned it that a consequence of its refusal to complete the audit could be that Epixtar would be late in filing its Form 10-K, which would lead to its delisting.  Epixtar raised this very danger in court when it opposed McClain's withdrawal motion.  As Epixtar's counsel stated in the April 13, 2006, hearing before the Court on McClain's withdrawal motion:

> . . .  If we don't have an extension to file the 10-K, there's no question that if the
> 10-K is not filed in the very near future, that the SEC will commence delisting

---

[6]  Epixtar had described this sequence of events in its 8-K filing on April 24, 2006.

proceedings, which could have a very detrimental impact on this debtor . . .

(PX 116, pp. 27 - 28.)

More important, Defendant DeSiato, McClain's managing partner at the time, has acknowledged that McClain was aware, ***before*** its withdrawal, that a consequence of its doing so could be Epixtar's delisting.  As DeSiato testified:

> Q.  Okay, At the time, were you aware that if Epixtar was late in its filing of its 10-K, that could lead to its delisting as a public company?
> A  I believe I heard something to that effect.
> Q.  At what point, before or after the filing of [McClain's] motion to withdraw?
>                    *    *    *    *
> A. I believe it was before.
> Q.  Okay. And how did you learn that?
> A. I believe Mr. Urban told us.

(DeSiato deposition, November 24, 2008, pp. 233 - 234.)  Moreover, Saul Reibstein, the CBIZ managing director directly responsible for causing McClain to withdraw, acknowledged in testimony nearly a year before the filing of this lawsuit, that it was foreseeable that Epixtar could base a claim for damages resulting from a delay in SEC filings caused by McClain's withdrawal. As Reibstein candidly testified:

> There were engagement activities initiated that were never completed, and the company could have taken the position that the failure to complete those procedures could have resulted in the delay of filing of required public information and, therefore, create damages to the company as a result of those delayed filings, all of which could have – could have and still could create liability.

(Deposition 1, p. 43.  Epixtar's Statement of Material Facts, Paragraph 36, n. 5.)

Finally, at the NASDAQ hearing on the delisting, shortly after Messrs. Miller and Greenman signed Morrison Brown's representation letter, Epixtar stated that it was McClain's wrongful resignation which led to its inability to timely file its 10-K  As Mr. Miller stated at the hearing,

We went ahead and retained new counsel [sic] in the form of McClain & Company who

MOSCOWITZ & MOSCOWITZ, P.A.
Mellon Financial Center • 1111 Brickell Avenue Suite 2050 Miami, Florida 33131 • Telephone 305.379.8300 • Facsimile 305.379.4404

proceeded to conduct an audit for the year end.  And we would have filed in a timely
manner had they not suddenly, and in our view capriciously resigned.  That is all
documented in various Form 10s filed with the commission.

(Hearing Transcript, June 12, 2006, pp. 5-6, Exhibit 2 to Epixtar 's Motion For Partial Summary

Judgment.)

47.  Mr. Miller states in his declaration that he was not asked at his deposition about this

particular representation letter.  He was only asked generally whether all of his representation

letters were true and he confirmed that they were.  Had he been asked about the Morrison Brown

letter he would have explained why it was both correct and consistent with the fact that McClain

caused Epixtar's delisting.  (See Miller Declaration, PX 115, at ¶ 7.)

48-51.  Epixtar's damages, to the extent they result from its delisting, were caused by

McClain's wrongful withdrawal, which was itself a result of CBIZ's tortious interference with

the audit engagement.  As stated above, *supra*, pp. 14 - 16, the delisting was a foreseeable

consequence of McClain's withdrawal.  In fact, that is what happened.  While it is correct that

Epixtar was finally unable to file its 10-K, and, therefore delisted, due to Rachlin's refusal to

consent to its 2003 and 2004 audits being included in the 2005 audit, Epixtar's inability to

remedy that problem was a direct consequence of McClain's resignation.  It was because of

McClain's precipitous resignation, right before the initial filing date for the Form 10-K, that

Epixtar was put in the position that when Rachlin refused to cooperate there was insufficient time

to respond.  As Martin Miller and William G. Urban testify in their declarations (PX 114 and PX

115), this was a problem which could have been solved, if there had been sufficient time.  If

Rachlin had similarly refused in early April, at the time McClain was completing its audit,

Epixtar had a number of options it would have pursued.  First, it would have sought the

assistance of the Court to authorize appropriate payment to Rachlin to undertake any additional

procedures it believed were required.[7]  It could also have requested the Court to require Rachlin's cooperation.  Failing either of those options, it would have requested McClain to reaudit the 2003 and 2004 financial statements.  As Mr. Urban testifies, if this had occurred in early /mid April, there would have been sufficient time for McClain to do so before the late-May deadline for filing.

The fact that it was too late at the end of May to undertake any remedial action in the face of Rachlin's refusal was a direct, foreseeable consequence of McClain's resignation.   In sum, "but for" McClain's resignation, Epixtar would not have been in the situation which it found itself in late May, when it was too late to remedy.

52 -53.  These selected statements from Mr. Greenman's deposition that he was aware of the requirement to include the 2003 and 2004 audits in the 2005 audit, that Rachlin refused to agree to that request on May 26, 2009, and that is Epixtar responsible for various of its filings correctly summarize what Mr. Greenman said.  (Mr. Greenman was not asked whether there were any other options which would have been available to Epixtar if Rachlin had refused similarly refused at an earlier date.)

54.  This statement mischaracterizes Mr. Greenman's testimony concerning Epixtar's internal controls.  He responded appropriately to a series of questions concerning his procedures and obligations for monitoring the effectiveness of internal controls.

55.  As stated above, *supra*, at pp. 8 - 12, the evidence shows that McClain's decision to resign was not made independently, but was a consequence of CBIZ's refusal to permit its employees to complete the audit.  Those facts were concealed from the Court at the time

---

[7] Kim Lamplough, the Rachlin audit partner, testified that "we were not in a position to undertake what we would need to do without compensation."  (Cited in Defendants' Motion, at p.12.)

**MOSCOWITZ & MOSCOWITZ, P.A.**
Mellon Financial Center • 1111 Brickell Avenue Suite 2050 Miami, Florida 33131 • Telephone 305.379.8300 • Facsimile 305.379.4404

McClain moved to withdraw. The reasons which McClain and the other Defendants gave to the Court and have stated in this proceeding are pretextual. The argument McClain resigned because it "could not trust Epixtar's representations," is a recent one and is contradicted by McClain's concession at the time that it found no evidence of financial wrongdoing or fraud.

56. This paragraph summarizes Defendants' arguments and alleges no new facts. Epixtar has already shown above that all of the facts alleged by Defendants in support of their summary judgment motion are either disputed, incorrect, or without any support in the record.

**EPIXTAR'S COUNTERSTATEMENT OF MATERIAL FACTS**.

To the extent that Epixtar's Response cites facts in the record of the case not included in its above responses or in its own Statement of Material Facts attached to its Motion For Partial Summary Judgment, they are stated below.

57. The Defendants contend that they were unable to complete their audit and, therefore, justified in seeking to withdraw. However, the facts show that the audit was more than substantially completed when they sought to withdraw. In fact they were only unable to complete the audit because Reibstein, in violation of McClain's and CBIZ's internal policies and their promises to state regulators, ordered work on the audit to stop. The audit was, for all intents and purposes, finished. Yin Law, the McClain audit manager, testified that the fieldwork was "substantially completed." (Yin Law deposition, p. 47.) Albert Molina, Epixtar's former controller, similarly testified that Epixtar had completed its work on the 10-K, and was waiting for McClain's final "polishes." (Molina deposition, p. 110.) Most important, McClain's own workpapers confirm that to be the case. The McClain "Audit Completion" memo states that "The audit fieldwork is completed on: 4/5/06." (PX 117.) Moreover, there was nothing about the two matters raised by McClain (*i.e.*, the Yeater issue and the 12b-25 filing) which prevented

McClain from rendering an opinion on Epixtar's financial statements. McClain admitted to the Court that these two issues did not indicate fraud or financial wrongdoing, or, indeed, that it found any indication of that. (Hearing, April 13, 2006, pp. 40 - 41, PX 116.) Thus, McClain was fully able to perform the audit and to issue an opinion[8] on the financial statements of Epixtar.

58. Defendants claim that their discovery of weaknesses in internal controls, specifically Epixtar's permitted to withdraw without rendering an opinion. Epixtar addresses in its Response why, as a matter of law, that is an untenable construction of the Engagement agreement. (See Response, at pp. 15 - 16.) Factually, the discovery of a weakness in a company's internal controls is not an impediment to doing an audit and issuing an opinion. The record here shows that was the understanding of the three firms auditing Epixtar's financial statements, including McClain. Yin Law, the McClain manager on the Epixtar audit, testified that she was aware of internal control weaknesses. However, that discovery did not impede McClain's ability to

---

[8] Auditors have a number of options in issuing their opinions: An unqualified opinion states that the the financial statements fairly present the financial condition of the company in accordance with Generally Accepted Accounting Principles ("GAAP"). A qualified opinion states exceptions to the observance of Generally Accepted Auditing Standards ("GAAS"), where the scope of the audit is limited or the auditor is unable to obtain necessary information, or to the fairness of the statements in accordance with GAAP, when the principles have not been observed or when not all necessary disclosures have been made. An adverse opinion is a reflection of the auditor's determination that the company's financial statements do not fairly present the financial position, results of operations, or changes in financial position of the company in conformity with GAAP; that is, an adverse opinion is issued when the auditor determines that the company has materially misstated certain items on its financial statements. Finally, a disclaimer of opinion expresses the auditor's inability to draw a conclusion. A disclaimer of opinion is generally issued when the auditor lacks sufficient information about the financial records to issue an overall opinion. AICPA, Professional Standards, § 508.10.

As an example, if Epixtar had actually committed some illegal act, that would not have caused McClain to be unable to issue an opinion. GAAS calls for auditors to issue adverse opinions or disclaimers of opinion in the event of a material illegal act. (See GAAS, § 317.18 ["If the auditor concludes that an illegal act has a material effect on the financial statements, and the act has not been properly accounted for or disclosed, the auditor should express a qualified opinion or an adverse opinion … ."]).

MOSCOWITZ & MOSCOWITZ, P.A.
Mellon Financial Center • 1111 Brickell Avenue Suite 2050 Miami, Florida 33131 • Telephone 305.379.8300 • Facsimile 305.379.4404

conduct its audit work and render an opinion.  To compensate for such weaknesses the McClain auditors undertook a substantive approach to the review, meaning that McClain did not rely on Epixtar's own statements about its books and records, but did its own evaluation.  That approach was sufficient so that McClain could issue an opinion.  As she testified:

> Q. And did you evaluate the internal controls of Epixtar?
> A. I might have.  Yes, I have.
> Q. Do you know what you concluded?
> A. That we would set our risk on maximum.  **That means we're not relying on the internal controls.**  We understand their internal control and then we're not going to do any testing on how the internal control would be effective or not .  We just maximize our risk and do the substantive approach.
>       \*    \*    \*    \*
> Q. **When you do that, where you do not rely on the company's internal control, is that indicated - and you don't withdraw, is that indicated in the opinion letter somehow?**
> A. **No.**
> Q. **So you can get a totally clean opinion?**
> A. You can get a totally clean opinion.  It could be efficiency reasons that you don't do the testing of the internal control and do the substantive testing. . . .

(Yin Law deposition, pp. 77 - 78.  Emphasis added.)  That testimony is corroborated by the testimony of Kim Lamplough, the Rachlin auditor who conducted the 2003 and 2004 audits.

> Q. In terms of what you observed about any weaknesses in internal controls and the response of management to it, I take it that didn't impair your ability to audit opinions for the years 2003, 2004; is that correct?
> A. Correct.  We were able to design compensatory audit procedures.

(Lamplough Deposition, p. 122.)  Morrison Brown, the successor auditor after McClain, did not find material weaknesses in internal controls.  As it stated in its Planning Memo, "We have discovered no condition that we believe to be a material weakness in internal controls from preliminary completion and review of the internal control questionnaire . . ." (PX 118.) Nonetheless, it determined, like McClain and Rachlin, that it did not need to rely on Epixtar's internal controls to do its audit.  Instead, like them, in performing its audit, it would "rely substantially on substantive test of balances." (PX 118.)

**Moscowitz & Moscowitz, P.A.**
Mellon Financial Center • 1111 Brickell Avenue Suite 2050 Miami, Florida 33131 • Telephone 305.379.8300 • Facsimile 305.379.4404

Furthermore, McClain's own work papers support Yin Law's testimony that the discovery of internal control weaknesses does not interfere with the completion of the audit. The workpapers show that McClain undertook, properly, to note internal control weaknesses and report on them to Epixtar's Audit Committee.[9] On April 6, 2006, following completion of the audit procedures, McClain drafted a report to Epixtar's Audit Committee detailing a series of weaknesses it found in Epixtar's internal controls, none of which it deemed a "material weakness." (PX 119.) None of these findings of "significant deficiencies" (there are six of them, with sub-parts) was ever given by McClain as a basis for withdrawal. Moreover, consistent with Yin Law's testimony, there is no indication in the Report that McClain regarded those findings as a breach of the Engagement Letter or a reason why it could not issue an opinion.

Most tellingly, the Report does **not** list Epixtar's failure to discover Yeater's criminal conviction as an indication of a weakness in Epixtar's internal controls. Surely a Report to its Audit Committee would include what the Defendants now claim is a material weakness, in addition to those which McClain deemed to be immaterial.[10] Morrison Brown took the same view a month and a half later. As noted above, it found no material weaknesses in internal controls. Moreover, as it further stated in its Planning Memo (PX 118):

> Based upon earlier communications with management, the auditors are satisfied that management has maintained the business environment, is conscious of their control responsibilities, and possesses adequate manager integrity for purposes of satisfying the requirement to mitigate audit risk.

---

[9] That is standard procedure. As Morrison Brown stated, "if we become aware of reportable conditions (SAS 60) or material weaknesses in the Company's internal control during the audit, such weakness will then be communicated to management and the audit committee as part of the internal audit process . . " (PX 118.)

[10] There is no question that by the date of this Report McClain had been aware of Yeater's criminal conviction for several weeks, and his criminal case for over two months.

**I HEREBY CERTIFY** that the undersigned attorney is appearing pro hac vice in this matter pursuant to court order dated May 9, 2007.

Respectfully submitted,

MOSCOWITZ & MOSCOWITZ, P.A.
Counsel to Plaintiff Epixtar Corp.
Mellon Financial Center, Suite 2050
1111 Brickell Avenue
Miami, Florida  33131
Tel: (305)379 - 8300
Fax: (305)379 - 4404

By: s/Norman A. Moscowitz
     Norman A. Moscowitz
     Florida Bar No.: 765643
     nmoscowitz@mmmpa.com
     Jane W. Moscowitz
     Florida Bar No.: 586498
DATE: July 31, 2009     jmoscowitz@mmmpa.com

MOSCOWITZ & MOSCOWITZ, P.A.
Mellon Financial Center • 1111 Brickell Avenue Suite 2050 Miami, Florida 33131 • Telephone 305.379.8300 • Facsimile 305.379.4404

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 31, 2009, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF.   I also certify that the foregoing document is being

served this day on all counsel of record identified below, either via transmission of Notices of

Electronic Filing generated by CM/ECF or if not authorized to receive electronically Notices of

electronic filing, sent via e-mail:

Kenneth S. Pollock, Esq.
Shendell & Pollock, P.L.
621 NW 53rd Street, Ste 310
Boca Raton, FL 33487

Samuel S. Lewis, Esq.
4000 Ponce de Leon Blvd., Suite 570
Coral Gables, Florida 33146l

Jerry M. Markowitz, Esq.
Ross R. Hartog, Esq.
Markowitz, Davis, Ringel & Trusty, P.A.
9130 S. Dadeland Blvd, Ste 1225
Miami, FL 33156

                                              s/Norman A. Moscowitz
                                              Norman A. Moscowitz

MOSCOWITZ & MOSCOWITZ, P.A.
Mellon Financial Center • 1111 Brickell Avenue Suite 2050 Miami, Florida 33131 • Telephone 305.379.8300 • Facsimile 305.379.4404