UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re | CASE NOS. 05-42040-BKC-AJC through |
| | 05-42049-BKC-AJC |
| EPIXTAR CORP., | (Jointly Administered) |
| Debtor. | |
| | CHAPTER 11 |
| _____/ | |
| EPIXTAR CORP., | ADV. No. 08-01208-AJC |
| Plaintiff, | |
| v. | |
| MCCLAIN & COMPANY, L.C., and CBIZ, INC., | |
| Defendants. | |
| _____/ | |

**PLAINTIFF EPIXTAR CORP.'S REPLY TO DEFENDANTS' RESPONSE
TO ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

    **Introduction**

    The basis for Epixtar's summary judgment motion is simple: the deposition testimony of a senior CBIZ manager, Saul Reibstein, that he stopped McClain's Epixtar audit by prohibiting CBIZ personnel from working on it. That decision caused McClain to breach its engagement agreement with Epixtar. CBIZ's and McClain's own documents show that this was done without justification, in violation of their own policies and procedures intended to conform to the requirements of Florida accountancy law, and in breach of their own agreement by which CBIZ is required to provide personnel and resources to McClain. CBIZ and McClain concealed all of

MOSCOWITZ & MOSCOWITZ, P.A.
Mellon Financial Center • 1111 Brickell Avenue Suite 2050 Miami, Florida 33131 • Telephone 305.379.8300 • Facsimile 305.379.4404

this from the Court when McClain moved to withdraw from the Epixtar engagement. Those facts demonstrate, as Epixtar alleges, that CBIZ tortiously interfered with McClain's audit engagement with Epixtar, and that McClain breached its contractual obligations to Epixtar under the engagement agreement.

Defendants in their Response don't attack or disavow this testimony. They can't. Reibstein is a senior CBIZ manager; they vouch for his credibility. Instead, they try to explain it away and argue that it actually is consistent with their defense that McClain withdrew because its partners independently decided they should. In making that argument, they rely on answers by Reibstein to leading questions by defense counsel at the end of his deposition in this case to the effect that he only ordered CBIZ employees off the audit *after* McClain had already resigned and moved to withdraw. However, that doesn't work. It makes no sense that Reibstein would have to give that order if McClain had already resigned pursuant to the unanimous agreement of its partners. Moreover, that testimony is inconsistent with Reibstein's clear and unambiguous earlier testimony that he did stop the audit, and it is inconsistent with a third version he gave, before he could be led by defense counsel, that he never gave such an order at all. It is also inconsistent with the testimony of McClain's audit manager that she was directed to stop working on the audit on April 8th, two days before McClain told Epixtar it would resign, and three days before McClain filed its motion before this Court.

The defects in this defense go beyond those inconsistencies. Defendants' other witnesses fail to corroborate it. For the most part, they either deny Reibstein ever made such a decision or claim to have no memory or knowledge as to whether he did so.

What this comes down to is a material, irreconcilable conflict among Defendants's own

witnesses: on the one side Reibstein, supported by other **defense** evidence[1], that he caused McClain to withdraw; and on the other, the later testimony of Reibstein in which he contradicts himself, and of a number of McClain's partners, after this lawsuit began, that they independently decided on their own to withdraw, testimony without any support in the documentary record. In sum, the defense is internally inconsistent and cannot be reconciled with the evidence which the Defendants have to concede is credible.

If this were a conflict between Epixtar's witnesses and the Defendants', then that would, of course, be the end of it and mean that summary judgment could not be granted. However, because it is a conflict within the defense, the Court should go further in its review. It should ask whether Reibstein's testimony supporting summary judgment is clear and unambiguous and consistent with other undisputed evidence; and whether the Defendants' later testimony, both of Reibstein and the McClain partners, has been manufactured to defeat summary judgment. If the Court makes that determination, then the Court should ignore the later testimony. As we show below, that is what has happened here. The Defendants, in later testimony by Reibstein and McClain partners, have sought to manufacture a defense in order to defeat summary judgment.

I.     **Reibstein's Testimony Clearly Shows CBIZ Interfered With the Epixtar Audit**

Defendants' Response ignores Reibstein's deposition testimony that he stopped McClain's Epixtar audit by ordering CBIZ employees to stop working on it. It's not surprising. There isn't much they can say. His testimony is clear, complete and unambiguous. It was given nearly a year before this lawsuit was filed in a deposition in a proceeding in which they (*i.e.*,

---

[1] It should be noted that Epixtar supports this summary judgment motion **solely** on the testimony of Defendants' own witnesses and on their internal documents (*e.g.*, policies and procedure manuals, e-mails) which they have produced in discovery.

CBIZ, McClain, DeSiato, and other McClain partners) are defendants.[2]

> Q. So you prohibited CBIZ employees from performing attest services for [Epixtar]?
> A. I prohibited CBIZ employees from performing any service to that client under the administrative service agreement and under the direct engagement request for that client.
> \* \* \* \* \*
> Q. You were the person that actually stopped the engagement, yes?
> A. Yes.
> \* \* \* \* \*
> **Q. Well, you stopped the engagement and were the reason why the services were never completed. You told the Miami office that they couldn't use staff to complete that engagement, correct?**
> **A. Yes.**
> Q. So to the extent that there's liability arising out of that, it's your fault? I mean, you made that decision, correct?
> A. Indeed.

(Emphasis added. Reibstein Deposition 1, pp. 44 - 45, Plaintiff's Exhibit 96.)

Defendants do not disavow Reibstein or challenge his credibility; in fact, they vouch for his credibility.[3] Instead, rather than confront this evidence directly, Defendants seek to reconcile

---

[2] Defendants seek to minimize its significance because it was first given in another case. However, it was in a lawsuit brought against them by William Urban, the McClain partner who was in charge of the Epixtar audit. The fact that it was given nearly a year before this case was filed doesn't diminish its significance; to the contrary, it adds to it. In any event, procedurally, it is testimony in the record of this case. It is admissible as an admission of the agent of a party, here CBIZ, pursuant to Rule 801(d)(2)(E). Alternatively, Reibstein was confronted with it at his deposition as a prior inconsistent statement. He had an opportunity to explain the inconsistency. He tried, but, as discussed, *infra*, at pp. 5 - 8, failed. With that foundation, it is admissible substantive testimony in this proceeding. See Rules 613(b) and 801(d)(1).

[3] Aram Kostoglian, MHM partner:

> Q. Okay. If Saul Reibstein were to say that he did do that, you would credit that?
> A. If Saul Reibstein said he had done that, I would have no basis for disagreeing with him.
> Q. But you don't know if he did or he didn't?
> A. That's correct.

(Deposition, pp. 191 - 192.)

William Hancock, MHM President:

> Q. If Mr. Reibstein in fact has testified under oath that he did give that direction,

Reibstein's testimony with their defense by arguing that Reibstein made the decision only after he learned of Epixtar's "threat" to bring a lawsuit against McClain if it went through with its decision to resign. However, that doesn't make any sense. Why, if as they also claim, the McClain partners had decided on their own to resign, before filing their motion, would Reibstein have to later issue such an order? In any event, for support, the Defendants cite to testimony which Reibstein gave in response to leading questioning by defense counsel at the end of his deposition in this case. However, that testimony is contradicted by other testimony of Reibstein's at the same deposition that he did not give such an order; he had a "vague recollection" that he merely made a "request."[4]

---

> that CBIZ employees could not be working on the Epixtar audit, would you doubt that testimony?
> A. If Saul – Mr. Reibstein said something under oath I wouldn't doubt that testimony.

(Deposition, p. 124.)

Michael Gleespen, CBIZ general counsel and corporate representative:

> Q. Do you take any position whether he is telling the truth here or not? (Gleespen was being asked about Reibstein's testimony that he prohibited "CBIZ employees from performing any service to [Epixtar][ under the administrative services agreement and under the direct engagement request for that client.")
> A. I know Saul to be a truthful person.
> Q. If he testified to this, it is the truth? Is that your opinion?
> A. Well, I have no opinion to think Saul would lie about something like this.

(Deposition, pp. 234 - 235.)

[4]  Q. Did you forbid CBIZ staff from working on behalf of this client?
A. Maybe.
Q. Well, do you remember; yes or no?
A. I sort of have a vague recollection that after they threatened us with – with litigation that I prevented the CBIZ staff from further –I – requested that CBIZ staff refrain from further work.
Q. It was a request?
A. Of course.
Q. Not a direction?

5

More important, the argument doesn't survive a careful review of the evidence. First, it is contradicted by Reibstein's clear and unambiguous testimony, cited above, that his order "stopped" the engagement. Second, McClain filed its motion to withdraw on April 11th, the same day Epixtar's counsel wrote the letter which Defendants contend was a "threat" of litigation. (Significantly, the letter is not cited in the motion as a ground for withdrawal. That's because it wasn't. It was an afterthought.) Defendants admit in their Answer to the Amended Complaint that the day before, " . . . on April 10, 2006, in a conference call between Epixtar and McClain, McClain discussed several concerns and notified Epixtar that *McClain intended to withdraw from its engagement . . . ."* (Answer, DE 310, paragraph 48. Emphasis added.) Reibstein himself further testified that he gave his directive *before* McClain filed its motion to withdraw. As he testified:

> Q. So after you prohibited any work for that client, that was the end of it, there was no more work performed by - for that client, correct?
> A. Well it wasn't that easy. Epixtar was, as I recall operating under Chapter 11 of the Federal Bankruptcy Code, and therefore there was a process that required bankruptcy court approval for the work to be discontinued; for work in process to be discontinued.
> Q. Okay, **so after you prohibited the work, there was a process where they had to apply to the court to get out of the assignment, correct?**
> A. **Yes.**

(Deposition, pp. 40 - 41. Emphasis added.) This time sequence is consistent with the testimony

---

> A. It – was a request.
> Q. Was it a direction?
> Mr. Shendell: Objection. Asked and answered.
> A. It could have been.
> Q. You don't know?
> A. I requested them to cease work.
> Q. That's your answer?
> A. Yes.

(Deposition, October 7, 2008, pp. 215 - 216.)

of Yin Law, McClain's manager on the Epixtar audit, that she stopped working on the audit on April 8th, a Saturday, after receiving a call from Mr. Urban. (Yin Law Deposition, at pp. 30 - 31.)[5]

Finally, Defendants' own witnesses contradict their argument that Reibstein gave the order after the withdrawal motion was filed. Michael Sahr, a McClain partner, testified that Reibstein never gave such an order.

> Q. Before the meeting with Mr. Seese that you just described Saul Reibstein told you, McClain, that no CBIZ employees could work on that audit, correct?
> A. No.
> Q. He did not?
> A. I never heard it.
> Q. You never hear that from anyone?
> A. The only thing I heard from Saul Reibstein, "Okay, resign."
>        \*    \*    \*    \*
> Q. Did Mr. Reibstein tell McClain that no CBIZ employees could work on the Epixtar audit?
>        \*    \*    \*    \*
> A. I was not aware of him *ever* saying that.

(Sahr deposition, p.154. Emphasis added.) Defendant Michael DeSiato, then McClain's co-managing principal, had no recollection of Reibstein doing or saying ***anything*** which affected McClain's ability to go on working on the audit.

> Q. Did he say or do anything which would have made it extremely difficult for McClain to continue with the engagement?
>        \*    \*    \*    \*    \*
> A. I don't recall him say anything which made it difficult for us to continue.

(DeSiato deposition 1, pp. 172 - 173.) William Hancock, the President of MHM, who was a participant in these discussions with CBIZ and McClain concerning withdrawal, also had no recollection of Reibstein giving such a directive.

> Q. You have no independent recollection then that Mr. Reibstein did that [*i.e.*, directed

---

[5] Contrary to this testimony, the Defendants assert that McClain continued to perform its duties through April 11th. (Response, at p. 20.) However, they offer no citation to the record in support of this claim. There is none.

       that no CBIZ employees could continue to work on the McClain audit of Epixtar]?
       A. No independent recollection.
       Q. One way or the other?
       A. Correct.

(Hancock deposition, pp. 122 - 123.) Aram Kostoglian, the other MHM partner who participated in the discussions among CBIZ, McClain and MHM regarding the resignation, also had no recollection of Reibstein giving any such order.

       Q. Okay. Now do you know if Saul Reibstein directed that CBIZ employees could not participate any further in the McClain audit?
       A. I have no knowledge of that.
       Q. One way or the other?
       A. One way or the other.

(Kostoglian deposition, p. 191.)[6]

In sum, Reibstein's initial testimony, given before this lawsuit was filed, is clear and unambiguous, corroborated by other evidence, see, *infra*, at pp. 10 - 12, and supports Epixtar's summary judgment motion.

## II. The Defense Is Internally Inconsistent And Later Testimony Manufactured to Defeat Summary Judgment Should Be Ignored By The Court

As shown above, Defendants' defense against summary judgment doesn't hold together. Their main witnesses - CBIZ, McClain and MHM partners, contradict each other. Their effort to reconcile the contradictions doesn't hold up to common sense and an examination of the record. They vouch for the credibility of Saul Reibstein, their own witness who gave three inconsistent versions of what he did, the first of which, prior to the filing of this lawsuit, supports Epixtar's motion for summary judgment.

---

[6] Michael Gleespen, CBIZ's general counsel, was the only defense witness who comes closest to supporting the Defendants' claim that Reibstein gave the directive after Epixtar's counsel "threatened" litigation. While Gleespen testified, *supra*, p.5 n.3, that Reibstein was a truthful witness, he also testified that he knew Reibstein did not give the directive on April 8th and that it would have been on the 10th or the 11th. However, he admitted that he never talked to Reibstein about this issue. Deposition, pp. 228 - 229. Thus, his testimony is not admissible as it is, at best, hearsay, and not based on personal knowledge. See Rule 56(e)(1).

Where there is a material conflict between the witnesses of the movant and the nonmovant summary judgment should not, of course, be granted.  However, when the conflict is among the nonmovant's own witnesses, here the Defendants, the reviewing court should examine the conflict and determine whether the nonmovant has manufactured later testimony in order to defeat summary judgment.  If the court determines that is what has happened, it can and should ignore the later testimony.  As the Supreme Court has stated, all of the Circuits

> have held with virtual unanimity that 'a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity. (Citations omitted.)

*Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806 (1999).  In *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986), the Eleventh Circuit followed the Second Circuit's decision in *Perma Research*[7] which held that ". . . a court may disregard an affidavit as a matter of law when it determines that the affidavit is a sham."  Further quoting *Perma Research*, it stated

> 'If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.' *Perma Research* at 578.  The Second Circuit determined that any issue raised by affidavit which was flatly contradicted by an earlier deposition was so suspect of untruthfulness as to be disregarded as a matter of law.

This has been the law in the Eleventh Circuit even before *Cleveland v. Policy Management Systems*.  As the Eleventh Circuit had earlier held in *Van T. Junkins and Associates v. U.S. Industries*, 736 F.2d 656, 657 (11th Cir.1984), in a case where the prior testimony is "crystal clear," given in response to "unambiguous questions," later testimony which is materially inconsistent, without any valid explanation, should be disregarded.  As the Court of Appeals stated,

---

[7] *Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572 (2nd Cir.1969).

> [w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.

Reibstein's testimony was "crystal clear." There was no ambiguity in the questions or any lack of clarity in his responses. Reibstein said flatly he "did it." That testimony "negate[s] the existence of any genuine issue of material fact." When Reibstein was confronted with that testimony at his deposition in this case he gave multiple responses. First, Reibstein fumbled for awhile and denied that he gave such an order, claiming it was merely a "request." Later, in response to friendly, leading questioning by defense counsel, which suggested that he did give such an order, but only after McClain filed the motion to withdraw, Reibstein agreed with that suggestion. However, as we showed above, that explanation makes no sense and is in direct conflict with Reibstein's earlier "clear" testimony and other defense evidence.

Equally difficult for the Defendants, Reibstein's earlier testimony is in direct conflict with the McClain partners' testimony that he didn't give such an order, at any time, and that they resigned solely because of their own independent decision. Clearly, the Defendants don't view this as a matter of credibility. They have already vouched for Reibstein, presumably for all three versions of his testimony.

Finally, there is no support in the Defendants' own contemporaneous communications for their manufactured testimony that McClain withdrew because its partners were concerned over the Yeater matter and the incorrect Form 12b-25. Their own e-mails contradict this later testimony; not a single one supports it. Their e-mails consistently reflect a desire to continue the engagement. On February 22nd, nearly a month after McClain learned of the criminal charges against Yeater, Michael DeSiato wrote to Reibstein that "[McClain] did the background checks and there is nothing that is an issue." (DeSiato e-mail, February 22, 2006, Exhibit 82.) On March 21, 2006, Michael Sahr, a McClain partner, wrote an e-mail to Reibstein in which he described

the nature of the charges against Yeater and explained that Epixtar had been unaware of them because it had done its background check before the charges were filed. Sahr stated that he was "troubled" by the charges but did not think he would "fire [his] client immediately" because of such charges. He then discussed allegations relating to other Epixtar officers which he stated were not material. Sahr concluded that based on consideration of the above and other factors, McClain decided to "do business with Epixtar." As he explained, "[w]e have made several other difficult decisions in the past 35 years (none ever dealt with rape charges) and our feeling in every case was that we were justified in doing business with the people involved in those cases." (Exhibit 91.) On March 23rd, Sahr, in his capacity as a CBIZ SF accountant, wrote to Epixtar's counsel regarding CBIZ SF's engagement to do Epixtar's 2005 tax returns, stating that he expected the work would be completed between April 18th and April 30, 2005. (Exhibit 92.) On April 5, 2006, Sahr wrote to Reibstein that Epixtar's CEO had told him that "neither the charges nor the plea will in any way effect [Yeater's] job performance which has been remarkable." (Exhibit 121.)

      Most tellingly, McClain's own workpapers show that its auditors did not even consider the Yeater issue a material weakness in internal controls. On April 6, 2006, following completion of the audit procedures, McClain drafted a report to Epixtar's Audit Committee detailing a series of weaknesses it found in Epixtar's internal controls, none of which it deemed a "material weakness." (PX 119.) The Report does not list Epixtar's failure to discover Yeater's criminal conviction as an indication of a weakness in Epixtar's internal controls. It does not mention Yeater at all. Surely a Report to Epixtar's Audit Committee would include what the Defendants now claim is a material weakness, in addition to those which McClain deemed to be immaterial.[8]

---

[8] There is no question that by the date of this Report McClain had been aware of Yeater's criminal conviction for several weeks, and his criminal case for over two months.

11

There is no way to reconcile these contradictions in a coherent defense. The only reasonable explanation for them is that the later testimony by Reibstein and the McClain partners was manufactured for the purpose of defeating a finding of liability. That kind of testimony does not raise a genuine issue of fact and, as a matter of law, should be disregarded by the Court. The Court should properly hold that Reibstein got it right the first time when he testified that he "stopped the [Epixtar] engagement."

### III.  CBIZ Engaged In Tortious Interference As It Used Wrongful Methods Without Justification

Defendants argue that Reibstein's decision, on CBIZ's behalf, was justified, as it was undertaken to protect CBIZ's own interests. First, as discussed above, the argument makes no sense: if McClain had already decided to resign and stopped working, as they claim, why did CBIZ need to take any action at all? Second, it wasn't within CBIZ's "discretion" to do so; the conduct was a breach of Florida law, CBIZ's own guidelines and its contract with McClain. Finally, because CBIZ used improper means in carrying out its scheme, under applicable law, its justification is irrelevant. In fact, just about everything it did was improper; most important, it misrepresented to this Court what it had done so that it would authorize McClain's resignation.

First, as to the law, since CBIZ used improper means to carry out its disruption of the Epixtar audit engagement, it may not defend on the ground of justification. As the Eleventh Circuit noted in *KMS Restaurant Corp, et al. v. Wendy's International, Inc.*, 361 F.3d 1321 (11th Cir. 2004), it is well-settled in Florida law that the use of improper means eliminates justification as a defense to tortious interference. As the Court of Appeals stated,

> Florida decisions also support KMS's contention that even where the defendant's motive is not purely malicious, a tortious interference claim may succeed if improper methods were used. *Ethyl*, 386 So.2d at 1225 - 1226 ("So long as improper means are not employed, activities taken to safeguard or promote one's financial and contractual interests are entirely non-actionable.")

*Id.*, at 1327. Quoting from an earlier decision in which it "reached this same conclusion," it stated "'The significant inquiry to determine the privilege of justification is whether the means employed are not improper.'" *Id.*[9]

The Defendants recognize that "misrepresentation" is an improper method.[10] Here, it is undisputed that the Defendants concealed from the Court and Epixtar the fact that CBIZ was depriving McClain of the personnel to finish the Epixtar audit. As shown above, the evidence demonstrates that CBIZ did so before the motion to withdraw was filed. However, even accepting Defendants' version that it was *after*, CBIZ never disclosed that to the Court or to Epixtar. At the time the Court entered the agreed order of withdrawal two weeks later, this conduct was still not disclosed.

It is clear why CBIZ concealed from the Court and Epixtar what it had done. As Epixtar showed in its summary judgment motion (DE 326, at pp. 6 - 8, supporting Statement of Material Facts, ¶¶ 10 - 16), CBIZ's decision was contrary to State accountancy law, which prohibits it from dominating or controlling McClain's conduct of its audits. It was also contrary to CBIZ's

---

[9] CBIZ's "justification," as discussed above, makes no sense and is contrary to the evidence. CBIZ allegedly ordered its employees off the engagement only after Epixtar's lawyer "threatened" litigation, thereby impairing McClain's independence. It argues that it acted to "ensure[] that its professional CPA employees were not being utilized in an engagement which might or could have threatened their employability as CPA professionals." (Response, at p.13.) However, as discussed above, Yin Law testified she and the other CBIZ employees were ordered to stop working on April 8th, several days before the litigation "threat." Moreover, since the litigation "threat" was allegedly made *after* McClain had already stopped work, the McClain partners had decided to resign, and the motion to withdraw had already been filed, why was it necessary to then order the employees' removal?

[10] They cite (See Defendants' Summary Judgment Motion, ¶ 42, p. 24) the Florida Standard Jury Instruction MI 7.2 which defines "improper means." It states that one who uses physical violence, misrepresentations, illegal conduct, threats of illegal conduct, or other improper conduct, "has no privilege to use those methods, and his interference using such methods is improper."

guidelines, which prohibit it from removing employees from an audit without the agreement of the engagement auditing partner, in this case, Mr. Urban.[11]  Finally, it was in violation of CBIZ's own administrative services agreement with McClain which obligates it to provide personnel to McClain to conduct its audits.  As the Administrative Services Agreement ("ASA") between CBIZ and McClain states,

> [CBIZ] *will* make its personnel available to [McClain], including . . . professional personnel with the background and experience to assist [McClain] in staffing engagements with [McClain]'s clients, including . . . ("CPAs")[12]

(See, Epixtar's Statement of Material Facts, ¶¶ 13 - 16, 35 - 46.)  Thus, the order to withdraw itself constituted improper means.  CBIZ must have been concerned that had it and McClain disclosed the truth, the Court would not have permitted McClain's withdrawal.

While the Defendants argue in their Summary Judgment Motion, contrary to CBIZ's manual and the ASA, that its provision of such personnel is not obligatory, again, Reibstein got it right.  It wasn't discretionary; CBIZ was required to provide the CPA staffing for an audit.  As he

---

[11] As CBIZ's manual states:

> The staffing of associated CPA firm attest engagements are within the exclusive control of the CPA firm Technical Director or the CPA firm's designee, and **no Company staff member on a CPA firm engagement can be disciplined, *removed* from the engagement or terminated without the consent of the CPA firm Technical Director or the CPA firm's designee.**

(CBIZ Manual, SP 06870, Exhibit 101.  Emphasis added.)

[12]  This is certainly the Defendants' understanding of the Administrative Services Agreement.  As McClain's policies and procedures manual states:

> The Administrative Services Agreement between our CPA firm and CBIZ states that CBIZ shall make adequate staff available to our CPA firm upon request.  **CBIZ is therefore contractually obligated to provide sufficient and sufficiently qualified staff to meet the needs of our CPA firm**.

(Emphasis added.  McClain Manual, SP 06946, Exhibit 22.)

testified:

> Q. What is CBIZ required to do under the [administrative services] agreement with regard to provision of personnel and other services?
> A. It is required to provide personnel and full support for the CPA firm in the conduct of a particular client engagement.
> Q. So, for example, on an audit, what kind of personnel would that mean?
> A. It would depend on the specifics of each audit engagement.
> **Q. In doing an audit, would that mean – would that include providing the CPAs and auditing staff?**
> **A. If it were required, yes.**
> **Q. Required as defined by whom?**
> **A. By the CPA firm.**

(Emphasis added. Reibstein Deposition. 2, pp. 41 - 42, Exhibit 21.)

Defendants fail to challenge, or even discuss, the undisputed record evidence which shows CBIZ's real motives. CBIZ acted to advance other interests at the expense of Epixtar's; not to protect itself from the risk of loss or harm. As Epixtar showed in its motion for partial summary judgment,[13] it is undisputed that the Epixtar audit engagement was an impediment to the acquisition of McClain by MHM practically from the beginning of the engagement. CBIZ was promoting this merger. However, MHM withdrew its offer to McClain in late January, 2006, only a few weeks after McClain signed the Engagement Letter, because it would not accept Epixtar as a client and McClain was unwilling to give it up. (Among other reasons, MHM did not like the fact that Epixtar was in bankruptcy.) When, a month and a half later, the "Yeater issue" came up, MHM and CBIZ again advocated for dropping McClain as a client. This time, when McClain's partners would not agree, Reibstein made it happen by depriving McClain of the means to finish the audit. Within two months, MHM renewed its offer to acquire McClain and the merger took place at the beginning of 2008.

In sum, the evidence in the record shows that CBIZ is liable for tortious interference.

---

[13] See Epixtar's Statement of Material Facts, ¶¶ 19 - 26, 47 - 50.

IV. **McClain Breached Its Engagement Agreement With Epixtar**

Defendants do not concede that McClain withdrew because CBIZ deprived it of the personnel to complete the audit. Ignoring that evidence, they continue to argue, as they did in their Summary Judgment Motion, that the resignation was warranted because of Epixtar's conduct. As Epixtar shows in its Response to their motion, McClain's stated reasons were pretextual.

However, McClain's resignation for the reasons shown here is a breach of contract. Implicit in any contract is the requirement that both parties act reasonably and in good faith. As the District Court of Appeal stated in *Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092, 1097-1098 (Fla. 1st DCA 1999),

> we find persuasive the reasoning of Justice Souter who, while on the New Hampshire Supreme Court, explained the implied duty, as follows:
>
> Under an agreement that appears by word or silence to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting. *Centronics v. Genicom Corp.*, 132 N.H. 133, 562 A.2d 187, 193 (N.H. 1989). Thus, where the terms of the contract afford a party substantial discretion to promote that party's self-interest, the duty to act in good faith nevertheless limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

The Eleventh Circuit has similarly held (applying New York contract law) that even where an agreement grants a party discretion to refuse to perform, that discretion must be exercised in good faith and fairly. A party may not arbitrarily refuse to perform.

> There may be a valid contract even where the contract expressly gives one party "absolute discretion" to perform. *Richard Bruce & Co. v. J. Simpson & Co.*, 40 Misc.2d 501, 243 N.Y.S.2d 503, 506 (Sup.Ct.1963) ("absolute discretion" means a discretion based on fair dealing and good faith -- a reasonable discretion). See also *A.W. Fiur Co. v. Ataka & Co.*, 71 A.D.2d 370, 422 N.Y.S.2d 419, 422 (1979) (a provision giving "absolute and exclusive right to reject any order for any reason whatsoever" does not give the defendant the right arbitrarily to refuse to perform).

*See Gregg v. U.S. Industries, Inc.*, 715 F.2d 1522, 1535 (11th Cir.1983).

McClain's conduct in refusing to complete the audit does not satisfy these implicit contractual obligations. In resigning, it acquiesced to CBIZ's unlawful domination and control of of its auditing practice, in violation of Florida law. It acquiesced to CBIZ's violation of both firms' guidelines and procedures and CBIZ's own contractual obligation to provide it with the manpower and resources to conduct its auditing engagements. Worse, it concealed from the Court and Epixtar that it was doing so. No construction of the Engagement Agreement would hold that withdrawal under these circumstances is permissible.

Accordingly, the Court should hold that, as a matter of law, McClain breached the Audit Agreement with Epixtar.

### V.     Conclusion

In sum, for all the above reasons, Epixtar respectfully requests that its motion for partial summary judgment be granted.

**I HEREBY CERTIFY** that the undersigned attorney is appearing pro hac vice in this matter pursuant to court order dated May 9, 2007.

> Respectfully submitted,
>
> MOSCOWITZ & MOSCOWITZ, P.A.
>
> Counsel to Plaintiff Epixtar Corp.
> Mellon Financial Center, Suite 2050
> 1111 Brickell Avenue
> Miami, Florida  33131
> Tel: (305)379 - 8300
> Fax: (305)379 - 4404
>
> By: s/Norman A. Moscowitz
> Norman A. Moscowitz
> Florida Bar No.: 765643
> nmoscowitz@mmmpa.com
> Jane W. Moscowitz
> Florida Bar No.: 586498
> jmoscowitz@mmmpa.com

DATE: August 14, 2009

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 14, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified below, either via transmission of Notices of Electronic Filing generated by CM/ECF or if not authorized to receive electronically Notices of electronic filing, sent via e-mail:

Kenneth S. Pollock, Esq.
Shendell & Pollock, P.L.
621 NW 53rd Street, Ste 310
Boca Raton, FL 33487

Samuel S. Lewis, Esq.
4000 Ponce de Leon Blvd., Suite 570
Coral Gables, Florida 33146l

Jerry M. Markowitz, Esq.
Ross R. Hartog, Esq.
Markowitz, Davis, Ringel & Trusty, P.A.
9130 S. Dadeland Blvd, Ste 1225
Miami, FL 33156

                                                              s/Norman A. Moscowitz
                                                                Norman A. Moscowitz